1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BRIDGFORD, GLEASON & ARTINIAN
Richard K. Bridgford (CA SBN 119554)
Richard.Bridgford@Bridgfordlaw.com
Michael H. Artinian (CA SBN 203443)
Mike.Artinian@Bridgfordlaw.com
26 Corporate Plaza, Suite 250
Newport Beach, CA 92660
Telephone:   (949) 831-6611
Facsimile:    (949) 831-6622

COOLEY LLP
William V. O'Connor (CA SBN 216650)
woconnor@cooley.com
4401 Eastgate Mall
San Diego, CA  92121-1909
Telephone:  (858) 550-6000
Facsimile:  (858) 550-6420

COOLEY LLP
J. Parker Erkmann (*Pro hac vice* to be filed)
perkmann@cooley.com
1299 Pennsylvania Avenue, NW, Ste 700
Washington, DC 20004-2400
Telephone:   (202) 776-2036
Facsimile:    (202) 842-7899

*Attorneys for Plaintiffs Delux Public Charter, LLC d/b/a
JSX Air and JetsuiteX, Inc.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR and JETSUITEX, INC., <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF ORANGE, CALIFORNIA, a municipality; BARRY RONDINELLA, Airport Director of John Wayne Airport, <br><br> Defendants. | Case No.  8:20-cv-02344-JLS-KES <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED** <br><br> Dept.: <br> Judge: |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................. 1

II. FACTUAL BACKGROUND ........................................................................... 3

    A.    Plaintiffs Provide Safe, Convenient, Crowd-Free, And Federally Authorized Air Transportation Services. ................................................. 3

    B.    Plaintiffs Have Been Safely And Efficiently Operating Out Of ACI Jet's FBO At JWA Since June 2018. ................................................ 5

    C.    JSX Seeks A Reasonable Accommodation ........................................... 7

    D.    The County Acted In Bad Faith ............................................................ 8

    E.    JWA Is Catering To A Politically Favored Group ............................. 10

III. ARGUMENT .................................................................................................. 11

    A.    Governing Law ................................................................................... 12

    B.    Plaintiffs are Likely to Prevail on the Merits of Their Claims .......... 12

        1.    The County's Restriction is Preempted – Counts I and II ........ 13

            a.    Airport Noise and Capacity Act ("ANCA") Preemption .................................................................. 13

            b.    Airline Deregulation Act ("ADA") Preemption ............ 17

        2.    The County's Restriction is Discriminatory – Count III .......... 20

    C.    An Injunction is Necessary to Prevent Irreparable Harm .................. 22

    D.    The Public Interest and Equities Strongly Favor an Injunction .......... 23

    E.    The Bond Should be Waived ............................................................... 25

IV. CONCLUSION ............................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Transp. Ass'n of Am. v. City & Cnty. of S.F.*,
266 F.3d 1064 (9th Cir. 2001) ................................................................. 17

*Am. Airlines, Inc. v. Wolens*,
513 U.S. 219 (1995) .............................................................................. 17

*Arapahoe Cnty. Pub. Airport Auth. v. FAA*,
242 F.3d 1213 (10th Cir. 2001) ............................................ 18, 19, 20, 21

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) ......................................................... 23, 24

*Baca v. Moreno Valley Unified Sch. Dist.*,
936 F. Supp. 719 (C.D. Cal. 1996) ......................................................... 25

*Bekele v. Ford*,
2011 WL 4368566 (N.D. Cal. Sept. 17, 2011) ........................................ 22

*Bible Club v. Placentia-Yorba Linda Sch. Dist.*,
573 F. Supp. 2d 1291 (C.D. Cal. 2008) .................................................. 25

*British Airways Bd. v. Port Auth. of N.Y.*,
564 F.2d 1002 (2d Cir. 1977) ................................................................ 18

*City & Cnty. of S.F. v. FAA*,
942 F.2d 1391 (9th Cir. 1991) ................................................... 11, 18, 20

*City of Burbank v. Lockheed Air Terminal Inc.*,
411 U.S. 624 (1973) .............................................................................. 13

*Clay Lacy Aviation v. City of L.A.*,
2001 WL 1941734 (C.D. Cal. July 27, 2001) ................................... 16, 18

*County of Orange v. Air Cal.*,
No. CV 85-1542 (Dec. 13, 1985) ............................................................. 6

*Doran v. Salem Inn, Inc.*,
422 U.S. 922 (1975) .............................................................................. 23

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) ......................................................... 12, 24

*Engquist v. Or. Dep't of Agric.*,
553 U.S. 591 (2008) .............................................................................. 21

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993) .............................................................................. 21

# TABLE OF AUTHORITIES
### (cont'd)

**Page(s)**

*Fowler Packing Co., Inc. v. Lanier*,
844 F.3d 809 (9th Cir. 2016) .................................................. 13, 21, 22

*Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*,
841 F.3d 133 (2d Cir. 2016) .................................................. 14, 15, 16

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) .................................................. 13

*Gordon v. Virtumundo, Inc.*,
575 F.3d 1040 (9th Cir. 2009) .................................................. 13

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) .................................................. 23

*Hodges v. Delta Airlines, Inc.*,
44 F.3d 334 (5th Cir. 1995) .................................................. 18, 20

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
803 F.3d 389 (9th Cir. 2015) .................................................. 12

*Johnson v. Couturier*,
572 F.3d 1067 (9th Cir. 2009) .................................................. 25

*Lair v. Bullock*,
697 F.3d 1200 (9th Cir. 2012) .................................................. 13

*Leiva-Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011) .................................................. 13

*McClellan v. I-Flow Corp.*,
776 F.3d 1035 (9th Cir. 2015) .................................................. 13

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) .................................................. 24

*Merrifield v. Lockyer*,
547 F.3d 978 (9th Cir. 2008) .................................................. 21

*Montalvo v. Spirit Airlines*,
508 F.3d 464 (9th Cir. 2007) .................................................. 14

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) .................................................. 13

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
240 F.3d 832 (9th Cir. 2001) .................................................. 23

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .................................................. 24

# TABLE OF AUTHORITIES
(cont'd)

**Page(s)**

*Womack v. Cnty. of Amador,*
   551 F. Supp. 2d 1017 (E.D. Cal. 2008) ............................................... 21

**Statutes**

42 U.S.C. § 1983 ............................................................................... 21, 22

49 U.S.C.
   § 40101(4) ...................................................................................... 17
   § 41713(b)(1) ............................................................................ 13, 17
   § 41713(b)(3) .................................................................................. 18
   § 47521, *et seq.* ........................................................................ *passim*
   § 47521(2)-(3) ................................................................................ 14
   § 47524(c)(1) .................................................................................. 14
   § 47524(c)(2) .................................................................................. 15
   §47524(d) .................................................................................. 16, 17

**Other Authorities**

14 C.F.R.
   § 16.1(a)(6) ..................................................................................... 21
   § 110.2 ............................................................................................... 7
   § 161.303(a) .................................................................................... 16

FAA Order 5190.6b ................................................................................ 16

11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed., 2020) ............................. 23

Spencer Custodio & Brandon Pho, *Will Coronavirus Patients Push
   Orange County Hospitals to the Edge?* (Voice of OC, Dec. 8,
   2020), https://voiceofoc.org/2020/12/will-coronavirus-patients-
   push-orange-county-hospitals-to-the-edge/ ........................................ 4

U.S. Constitution ........................................................................... *passim*

# I. INTRODUCTION

As a result of Defendants' unlawful, discriminatory, and federally preempted conduct, Plaintiffs require immediate injunctive relief to avoid the irreparable injury of being denied access—which requires them to terminate their on-demand flight services—at John Wayne Airport ("JWA") effective January 1, 2021. Defendants' conduct violates the Supremacy and Equal Protection Clauses of the Constitution and irreparably harms Plaintiffs. Specifically, Defendants have imposed a local access restriction that conflicts with federal statutes governing an air carrier's right to enjoy reasonable access to, and provide rates, routes, and services at, a public use airport. Without the requested injunctive relief, Plaintiffs immediately and permanently will lose 35% of their business and their JWA routes and services will be dealt a fatal blow. All JSX's customers will have their itineraries cancelled, which will not only ruin customer travel plans but damage Plaintiffs' goodwill and reputation.

Since 2018, Plaintiffs have safely provided convenient, economical, and crowd-free air transportation services at JWA. There have been no accidents, incidents, or security issues for the entire time that Plaintiffs have operated at JWA. In order to comply with federal law, Plaintiffs have boarded and deplaned their customers at locations that are *not* Security Identification Display Areas ("SIDA"). At JWA, there are several non-SIDA locations that would accommodate Plaintiffs' federally approved operations—including operating out of a non-SIDA location managed by an airport tenant, Aviation Consultants, Inc. ("ACI Jet"). ACI Jet is known as a "fixed base operator" ("FBO") and it offers aircraft operators ground-based services, such as fuel and a location for non-SIDA customers to board aircraft. JSX requires access to a non-SIDA site at JWA in order to service flights to other non-SIDA airport locations.

Unless Plaintiffs are granted relief, Orange County ("County")—the owner, operator, and sponsor of JWA—will begin to unlawfully deny Plaintiffs access to JWA on January 1, 2021. The County has refused to provide Plaintiffs the right to

board and deplane customers at a non-SIDA location at JWA (such as at the FBO, ACI Jet, where Plaintiffs currently operate). Specifically, the County recently approved a new, *mandatory* lease term in the FBOs' leases that was specifically written to prohibit Plaintiffs from accessing JWA (the "Restriction"). The Restriction, coupled with the County's refusal to provide accommodations to Plaintiffs elsewhere at JWA, effectively eliminates Plaintiffs' access to JWA, and eliminates its routes and services in violation of federal law. No other operator is affected by the Restriction: only Plaintiffs are being excluded. The County has offered no justification for this discriminatory conduct. However, the County's conduct appears politically and financially motivated. Simultaneous with its decision to eliminate Plaintiffs from JWA, the County announced that two large airlines— Spirit and Allegiant (which are noisier and have lower customer ratings than Plaintiffs)—will begin serving JWA and fly routes currently served by Plaintiffs. To prevent this unconstitutional access restriction and elimination of JSX's federally authorized services, Plaintiffs seek a return to the *status quo ante*: reasonable access and accommodation at a non-SIDA location at JWA.

*First*, Plaintiffs are likely to succeed on the merits of their claims. The County's refusal to provide Plaintiffs with reasonable accommodations violates the Supremacy Clause, the Equal Protection Clause, and federal statutory schemes that expressly preempt the arbitrary and discriminatory access restriction.

*Second*, Plaintiffs will be irreparably harmed if they are not provided a reasonable accommodation at JWA (*i.e.*, the ability to board and deplane customers in a safe and efficient manner at a non-SIDA location). Plaintiffs' constitutional rights have been (and continue to be) violated (which constitutes *per se* irreparable injury); Plaintiffs are facing an existential crisis that threatens their continued viability; and Plaintiffs are facing incalculable and irreversible damage to their goodwill, business and customer relationships, and reputation. Meanwhile, the County faces no prejudice with a return to the *status quo ante*: Plaintiffs have been

legally operating at JWA for more than two years; have an impeccable safety record; and are fully compliant with all applicable laws.

*Third*, the equities and the public interest—a joint analysis in this context—favor preliminary relief. The County has blatantly violated federal law with its access restriction. In so doing, it has not only harmed Plaintiffs, but also Plaintiffs' customers, Plaintiffs' JWA-based employees, and communities that are connected to Southern California via routes to and from JWA. A return to the *status quo ante* is in the public's interest and will prevent further unlawful government conduct.

## II. FACTUAL BACKGROUND

### A.  Plaintiffs Provide Safe, Convenient, Crowd-Free, And Federally Authorized Air Transportation Services.

Plaintiff Delux Public Charter LLC d/b/a JSX Air ("JSX") is a federally licensed "on-demand" air carrier ("Part 135" carrier). (Pls.' Compl., ECF No. 1, at ¶¶ 1, 22, 31 ("Compl.").) JSX is *not* an airline and cannot operate similar to, or be grouped with, airlines. (Compl. ¶¶ 1, 31.) JSX operates 30-seat Embraer 135 and 145 aircraft on behalf of its customer, Plaintiff JetSuiteX, Inc. ("JetSuiteX").[1] (*Id.* ¶¶ 5, 31.) JetSuiteX is a federally licensed "indirect air carrier" who partners with JSX to market air transportation. (*Id.* ¶ 6.) JetSuiteX decides where a flight will depart from, what time it will depart, the destination airport, charters an entire JSX aircraft to operate the flight, and then sells tickets directly to customers. (*Id.* ¶¶ 14, 30.) The partnership between JSX and JetSuiteX is commonplace, safe, and fully compliant with all laws and regulations. (*Id.* ¶ 6.) Plaintiffs have not had an accident, or security issue since initiating service in 2016. (*Id.* ¶¶ 5, 23, 31.)

JSX is required by federal law to interact with its customers differently than airlines. Federal regulation prohibits JSX's customers from boarding or deplaning at

---

[1] The complete factual background is set forth in Plaintiffs' Complaint for Declaratory and Injunctive Relief. (ECF No. 1.) Plaintiffs hereby re-incorporate the allegations in the Complaint into this Application as if fully set forth herein.

JWA's SIDA terminal building (absent a reasonable accommodation on the part of the County, discussed *infra*).  (Compl. ¶¶ 36, 48, 52, 60.)  A SIDA location—such as JWA's terminal—requires all persons to pass through a Transportation Security Administration ("TSA")-checkpoint before entering.  (*Id*. ¶ 29.)  Notwithstanding JSX's different customer screening process, because JWA is a public use airport, all air carriers—including carriers like JSX with non-SIDA customers—are federally entitled to access it on reasonable and non-discriminatory terms.  (*Id*. ¶ 32.)

TSA checkpoints—and the crowds, frustration, and delays associated with them—are ubiquitous for the average traveler.  But not so for Plaintiffs' customers.  JSX operates pursuant to a federally authorized regulatory scheme that permits (and can require) its customers to be screened separately from TSA checkpoints.  (*See* Compl. ¶ 34.)  This enables JSX's customers to bypass large crowds, long lines, and the typical time spent waiting in the airport, which is imperative during the COVID pandemic.[2]  To be sure, JSX has implemented security protocols that *exceed* TSA requirements, but it screens customers (maximum 30 customers per flight) more rapidly than the airlines that operate from the SIDA terminal (which requires a TSA checkpoint).  (Compl. ¶ 34.)  JSX's customer-centric approach to air transportation has led it to be voted the highest rated air carrier in the country.  (*Id*. ¶¶ 5, 37-38.)  JSX also consistently doubles the airlines' scores on customer-satisfaction surveys.  (*See* Declaration of Alex Wilcox ("Wilcox Decl."), ¶ 35.)  Customers love JSX's crowd-free service; love a safer and more convenient way to travel; and love having an option for short-haul service that is more efficient than driving.

The regulatory regime governing SIDA and non-SIDA locations is integral to

---

[2] With COVID numbers increasing in Orange County, the County's access restriction gains added significance.  (*See* Spencer Custodio & Brandon Pho, *Will Coronavirus Patients Push Orange County Hospitals to the Edge?* (Voice of OC, Dec. 8, 2020), https://voiceofoc.org/2020/12/will-coronavirus-patients-push-orange-county-hospitals-to-the-edge/.)  Health- and safety-conscious customers will be forced to cancel holiday travel plans due to the County's conduct.

understanding the intentionality behind the County's access restriction. A customer who boards a flight from a non-SIDA location (*e.g.*, JSX's Concord, California service) cannot, as a matter of federal law, deplane into a SIDA location (*e.g.*, JWA's terminal). (Compl. ¶¶ 69, 84.) This is because a non-SIDA customer cannot enter a SIDA location or it would defeat the entire purpose of SIDA compliance. Therefore, JSX's customers cannot use the SIDA areas of any airport, including the terminal at JWA, as a result of federal law. (*Id*. ¶¶ 32, 64.) But this has not been a problem, nor is it a basis to discriminate or limit JSX's access to JWA (and in fact opens up air travel to hundreds of airports without SIDA locations). Every flight that JSX has flown for the past five years has operated out of a non-SIDA location, without incident. (*Id*. ¶¶ 31, 36.) This includes over 156,000 customers at JWA alone, all of whom utilized ACI Jet's non-SIDA FBO. (*Id*. ¶ 49.)

**B.      Plaintiffs Have Been Safely And Efficiently Operating Out Of ACI Jet's FBO At JWA Since June 2018.**

JWA's day-to-day functions are managed by its Airport Director, Defendant Barry Rondinella ("Rondinella"). (Compl. ¶ 16.) One of his duties is to negotiate and enforce lease terms with airport tenants, such as FBOs. Rondinella does this consistent with direction from the County and the County's Board of Supervisors ("Board"). (*Id*.)

Currently (through the end of 2020), JSX subleases space and purchases fuel from ACI Jet, and in return ACI Jet provides a location for JSX's customers to board and deplane. (Compl. ¶¶ 54, 72, 99.) Neither ACI Jet nor JSX had any intention of terminating this relationship. (*Id*. ¶ 53.; Declaration of Bill Borgsmiller ("Borgsmiller Decl."), ¶ 14.) But ACI Jet leases its premises from the County, and accordingly the County has the ability to terminate or not renew ACI Jet's lease if it does not agree to County-imposed terms. (Compl. ¶ 75.) Due to the Restriction, ACI Jet is being forced to deny JSX access to its non-SIDA FBO location as of January 1, 2021. (*Id*. ¶ 104.; Borgsmiller Decl. ¶ 14.)

Specifically, during summer 2020, the County and Rondinella began the process of negotiating new leases with the FBOs, including ACI Jet ("Leases"). (Compl. ¶ 55.)  The County provided the FBOs a Hobson's Choice:  accept new, mandatory lease terms or face eviction.  (*See id.* ¶¶ 9, 64.)  At the September 15, 2020, Board meeting, the County approved the new lease terms.[3]  The most relevant new lease term—the Restriction—prohibits the FBOs from providing services to JSX as of January 1, 2021.  (*Id.* ¶ 8.)  In fact, Rondinella told multiple people that the County's specific intent was to eliminate JSX from JWA.  (*Id.* ¶¶ 16, 32, 57.)  Although the County did not expressly name JSX in the Leases, it intentionally drafted the Restriction for the sole and intentional purpose of making it *impossible* for JSX—and only JSX—to operate at JWA.  (*Id.* ¶¶ 9, 16, 57, 64, 134.)  The Restriction reads:

> **LESSEE shall not permit the operation of a Regularly Scheduled Commercial User as defined in section 2.40 of John Wayne Airport's Phase 2 Commercial Airline Access Plan and Regulation, as may be amended from time to time**.

(*Id.* ¶ 63.)  The Access Plan[4] referenced in the Restriction classifies JSX as a "Regularly Scheduled Commercial User."[5]  (*Id.* ¶ 65.)  The only other operators who fit in this definition are airlines.  (*Id.* ¶ 195.)  But because the airlines are required to operate from SIDA locations—namely, the terminal—the Restriction applies uniquely to JSX.  Put another way, the airlines *never* operated out of the non-SIDA FBOs, have *always* operated out of the SIDA terminal, and are *federally prohibited* from utilizing the FBOs.  (*Id.* ¶¶ 65-66, 102.)  The Restriction thus does not affect

---

[3]  During this meeting, County counsel advised the County that federal statutes (discussed *infra*) impose a "very strict, very stringent FAA approval process" before a local noise or access restriction is enacted.  The County did not attempt, much less complete, the "very strict, very stringent" process.  (Wilcox Decl. ¶ 59.)

[4]  The Access Plan is a byproduct of a 1985 Settlement Agreement (and subsequent amendments) entered into by the County and airport stakeholders.  It imposes annual limits on the number of customers that JWA can serve.  (*See* Stipulation for Entry of Final Judgment by Certain Settling Parties, *County of Orange v. Air Cal.*, No. CV 85-1542 (Dec. 13, 1985), as amended; Compl. ¶¶ 63 & n.8, 98.)

[5]  This is a County-specific definition that conflicts with federal law.  Under FAA regulations, JSX is an "on-demand operation."  *See* 14 C.F.R. § 110.2.

them at all.  Taking this into account, the Restriction actually reads:

**[The FBOs] shall not permit the operation of [JSX]**.

This is intentional and specific targeting of JSX.  Indeed, if a non-JSX aircraft operating under the same federal authority (Part 135) and utilizing the same aircraft as JSX arrived at JWA on January 2, 2021, it would be permitted to board and deplane its customers at an FBO.  (Compl. ¶ 68.)  JSX is the *only* operator affected by the Restriction.  (*Id*. ¶¶ 65-66, 102.)

JSX's elimination from JWA is not a coincidence or an accident.  Defendants intended to make it *impossible* for JSX to continue operating out of JWA.  In separate conversations that occurred on September 11, 2020, Rondinella admitted to both JSX CEO Alex Wilcox as well as one of ACI Jet's owners (Joe Daichendt) that the Restriction was specifically intended to prohibit JSX—and only JSX—from operating at JWA.  (Compl. ¶ 75.)  Defendants have not provided any basis, justification, or reason for this systematic elimination of JSX.  (*Id*. ¶ 194.)

**C.     JSX Seeks A Reasonable Accommodation**

JSX has informed the County and Rondinella several times that it is willing to operate at JWA in whatever manner they prefer, so long as JSX is accommodated in a reasonable and non-discriminatory manner at a non-SIDA location.  (Compl. ¶ 53, 74-79.)  The County and Rondinella have denied or ignored each of JSX's proposals.  To be sure, JSX is happy to remain at ACI Jet.  But JSX has also offered several other options for accommodation at JWA:

(1) Boarding and deplaning out of the unused U.S. Customs and Border Protection Federal Inspection Service ("FIS") area when it is not in use. The FIS was built to receive international flights and thus is designed to segregate SIDA and non-SIDA customers.  JWA has not serviced an international flight since summer 2018 and thus the FIS is available;

(2) Constructing a corridor in an underutilized portion of the terminal to provide a non-SIDA area for customers to board.  A similar arrangement works without incident at other airports (*e.g.*, Albuquerque, New Mexico and Lexington, Kentucky);

(3) Utilizing the same process that charters (*e.g.*, sports teams) use; and

(4) Staging passengers at ACI Jet and then transporting customers for direct boarding at an underutilized gate in the terminal.

(Wilcox Decl. ¶¶ 54-58, 64-65, 76, Ex. F.)  In two November 19, 2020, letters to JSX, the County acknowledged each potential accommodation, but provided factually inaccurate and self-serving "reasons"—or no reasons at all—why none of them work. (*Id*. ¶¶ 76, Exs. F, G.)  Instead, despite knowing JSX's federally approved regulatory status, the County provided one "option" for JSX:  to board from the SIDA terminal. (*See* Compl. ¶ 4, 82-85, 104.)  The County knows that this is federally prohibited; knows that it is factually impossible because several of JSX's airport partners do not have SIDA locations (*e.g.*, Concord, California does not have a TSA checkpoint); and knows that JSX's business model would be crushed and rendered financially nonviable.  (*Id*. ¶¶ 83, 110.)  This "option" is a Catch 22:  if JSX could operate out of the SIDA terminal, it would not be seeking an accommodation at non-SIDA locations.  The County's "option" is no option at all.

In summary, the County's conduct (which is unconstitutional as demonstrated *infra*), has limited JSX's ability to access JWA.  The County is requiring one of two things, both of which are impermissible:  (1) the County is trying to force JSX to change its federally authorized business model (including by stopping service to all non-SIDA airports) and operate out of the SIDA terminal; or (2) the County is trying to force JSX to entirely stop providing routes and services to JWA by eliminating *all* non-SIDA locations for boarding and deplaning.  Both of these are impermissible and constitute unlawful restrictions on JSX's ability to access JWA.

## D.   The County Acted In Bad Faith

The County approved the FBO Leases, including the Restriction, on September 15, 2020. (Compl. ¶ 62.)  It then immediately offered JSX assurances that JSX would be able to operate at JWA in 2021.  (*Id*. ¶¶ 88, 95.)  It is unclear whether the County's promise of an "olive branch" was the result of the approximately 5,500 emails that JSX's customers sent the County to protest the access restriction, (*Id*. ¶¶

89-90), or was simply its recognition that the Leases were invalid due its Counsel's advice that a "very strict, very stringent" federal process is required to restrict an airport user's access, (*id*. ¶ 140).  Regardless, the County requested that JSX *not* pursue legal remedies as it was prepared to offer JSX an accommodation after the November 2020 election.  (*Id*. ¶¶ 90-91, 95.)

The County also engaged in conduct—which in hindsight appears to have been a ruse—to suggest that the promised "olive branch" was forthcoming.  For example, on September 21, 2020, the County suggested that JSX would be permitted to operate out of ACI Jet for another year while alternative accommodations were agreed upon.  (Compl. ¶ 93.)  Indeed, the *status quo ante* that JSX seeks here was originally suggested (but subsequently retracted) by the County.  Then, on September 25, 2020, JWA and JSX met to discuss alternative accommodations, including the four discussed *supra*.  (*Id*. ¶ 94.)  After this meeting, JWA confirmed that a workable and reasonable proposal would be offered after the elections.  (*Id*. ¶ 95.)

Moreover, under the Access Plan, each air carrier at JWA must apply for, and receive, an annual "allocation" of customers that it can provide service to for that year.  (Compl. ¶ 99.)  Since 2018, JSX has approved an allocation to JSX of approximately 100,000 customers. (*Id*.)  On September 11, 2020, JSX applied for a 2021 allocation that matches its 2020 allocation.  (Wilcox Decl. ¶ 52, Ex. D.)  Rondinella and his staff prepared a report for the November 3, 2020, Board meeting which recommended that the Board approve JSX's complete 2021 allocation request.  (*Id*. ¶ 73, Ex. E.)

Based on these assurances from the County and the availability of numerous options for JWA to accommodate JSX, JSX has continued to sell tickets to customers for flights departing to or arriving at JWA after January 1, 2021; to schedule existing and new routes that incorporate JWA in the city-pairing after January 1, 2021; enter into agreements to service new cities from JWA after January 1, 2021; and market its services to the people who fly into or out of Orange County.  (Compl. ¶ 111.)  All

1  of this was done publicly and the County never told JSX that it was going to eliminate

2  its access to JWA.

3       That is, until the County sent JSX two letters on November 19, 2020.  (Compl.

4  ¶ 82-85.)  The letters terminate JSX's ability to operate out of JWA.  (*Id*. ¶ 83, 110.)

5  ACI Jet was also forced, because of the lease Restriction, to send a letter terminating

6  JSX's use of its FBO for boarding.  (*Id*. ¶ 53.)  Given that these terminations were

7  wholly unexpected and inconsistent with express statements that the County and

8  Rondinella had made, JSX anticipated that the Board would discuss JSX's access

9  issues before the end of the year.  (*Id*. ¶ 86.)  However, on December 10, 2020, the

10  agenda for the final board meeting of 2020 was published.  JSX was not included on

11  it.  (*Id*.)  Final supplemental items were added to the agenda on December 11, 2020.

12  JSX was again conspicuously absent from the agenda.  (Wilcox Decl. ¶ 80.)  JSX

13  thus has no option but to seek emergency relief from this Court to ensure that it will

14  remain able to access JWA (and service its routes) as of January 1, 2021.

15      **E.**    **JWA Is Catering To A Politically Favored Group**

16       It appears (and discovery is likely to confirm) that the County was motivated

17  to exclude JSX by a desire to increase the number of airlines that use JWA.

18  Circumstantial evidence to this effect is overwhelming.  For example, on November

19  17, 2020—while the JSX termination letters were being circulated for signature—

20  JWA announced that two new airlines, Spirit Airlines ("Spirit") and Allegiant

21  Airlines ("Allegiant"), would begin offering service at JWA in 2021.  (Compl. ¶¶

22  104, 108-09.)  Around the same time, Southwest Airlines ("Southwest") announced

23  new routes from JWA in 2021.  (Wilcox Decl. ¶ 68)  Each of these airlines market to

24  the same customers as JSX.  Also, some of the routes offered by JSX compete with

25  the routes that were *recently added* by the airlines (*e.g*., Reno, Oakland, and Las

26  Vegas). (Compl. ¶ 109.)  JWA benefits from more airlines (as opposed to on-demand

27  carriers like JSX) because it forces more customers into the revenue-producing SIDA

28  terminal.  (*Id*. ¶¶ 32-33.)

JSX takes no issue with increased competition and encourages a competitive and diverse cast of air carriers, routes, and services at JWA. But due to the Access Plan and the generally paltry economics surrounding air carriers in the era of COVID, the introduction of these airlines was almost certainly premised on the removal of JSX. (Compl. ¶¶ 67, 104, 108-09, 141.) Not only does JSX's elimination free up customer allocations and landing slots for these new entrants, but it also mitigates their need to compete with JSX—the highest rated air carrier in the country. (*Id*. ¶ 5.) The County's political favoritism and anti-competitive conduct is both a violation of the Equal Protection Clause and inconsistent with the policies underlying federal law governing competition among aeronautical service providers.

## III. ARGUMENT

The County is required, by federal law, to allow JSX to provide federally authorized air transportation services at JWA (including a non-SIDA location for boarding and deplaning) on reasonable and non-discriminatory terms. *See, e.g.*, *City & Cnty. of S.F. v. FAA*, 942 F.2d 1391, 1393 (9th Cir. 1991). The County can satisfy this federal obligation to provide JSX with access to JWA several different ways. But it has refused to do so. It has refused to allow JSX to utilize a non-SIDA location inside the terminal; it has refused to allow JSX to utilize a non-SIDA location outside of the terminal; and now it has decided that JSX cannot utilize ACI Jet or any other FBO. Taken together, the County has prohibited JSX from operating anywhere at JWA. The County's attempt to eliminate JSX's ability to offer its federally authorized non-SIDA routes and services through this access restriction is unconstitutional, preempted, and discriminatory.

Plaintiffs will be irreparably harmed if the County is not enjoined from enforcing this access restriction when the Restriction becomes effective on January 1, 2021: Plaintiffs' constitutional rights will be violated (which constitutes *per se* irreparable injury); Plaintiffs' business will face an existential threat of continued viability; Plaintiffs' customers—including residents of the County whose health

requires a socially distanced and crowd free air transportation option—will lose an option to travel during the holidays (and beyond); and communities with service provided by JSX will lose an economical, safe, and non-stop option to travel to and from JWA.  The County faces no prejudice if the parties return to the *status quo ante*.

And finally, the public interest and balance of hardship both warrant a return to the *status quo ante* pending a full trial on the merits.  The public interest is always harmed when a state actor violates the Constitution.  Moreover, the traveling public, other airport sponsors, and JSX's employees will be harmed if the County's unlawful conduct is not enjoined.  A temporary restraining order is thus warranted.

## A.    Governing Law

A temporary restraining order is warranted when Plaintiffs:  (1) are likely to succeed on the merits of their claim; (2) will suffer irreparable harm in the absence of preliminary relief; (3) can show that the balance of hardships tips in their favor; and (4) can show that the injunction is in the public interest.  *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 399 (9th Cir. 2015).  Because relief is sought against the County, the "last two factors merge."  *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citation omitted).

## B.    Plaintiffs are Likely to Prevail on the Merits of Their Claims

In this Court, likelihood of success on the merits "is the most important" factor.  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citations omitted).  A plaintiff "need not demonstrate that it is more likely than not that they will win on the merits."  *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011).  Instead, a plaintiff need only show "that there is a 'substantial case for relief on the merits.'"  *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012) (citation omitted).  Once established, "the burden shifts to the non-moving party to show a likelihood that its affirmative defense will succeed."  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007) (citations omitted).

The County's Restriction, coupled with its refusal to grant Plaintiffs

reasonable accommodations, is preempted by the Airport Noise and Capacity Act ("ANCA"), 49 U.S.C. § 47521, *et seq*., and the Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713(b)(1).  Moreover, it is black-letter law under the Equal Protection Clause that a state actor cannot purposefully exclude one party to placate a more powerful or politically favored group.  *See Fowler Packing Co., Inc. v. Lanier*, 844 F.3d 809, 816 (9th Cir. 2016) (holding that politically motivated exclusion "would not survive even rational basis scrutiny").  Plaintiffs have satisfied their burden.

### 1.    The County's Restriction is Preempted – Counts I and II

Under the Supremacy Clause of the Constitution, local laws that conflict with federal law are "without effect."  *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1039 (9th Cir. 2015) (citations omitted).  If a local rule or policy conflicts with federal law, it is preempted.  *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1060 (9th Cir. 2009).  This avoids a patchwork of local regulations and ensures that interstate commerce is not negatively impacted by opportunistic or otherwise idiosyncratic local rules.

In the aviation context, Congress has preempted the field of aviation and air carrier regulation such that state and local governments are not permitted to directly or indirectly regulate the air carrier industry.  *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 633 (1973); *see also Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir. 2007) ("[W]e conclude that Congress has indicated its intent to occupy the field of aviation safety.").  Generally, if a local government enacts a rule or policy that has the effect of regulating air transportation, it is invalid under the Supremacy Clause of the United States Constitution.  *Id.*

### a.    Airport Noise and Capacity Act ("ANCA") Preemption

ANCA is Congress' most authoritative expression of federal preemption in the area of access to public airports and was adopted to ensure a uniform federal aviation policy regarding airport access restrictions.  49 U.S.C. § 47521(2)-(3) (redressing the "uncoordinated and inconsistent restrictions on aviation that could impede the national air transportation system").  Because Congress recognized that airport

sponsors may attempt to control access to their airports, Congress expressly found that access restrictions "must be carried out at the national level." *Id*. § 47521(3).

ANCA's requirements for enacting access restrictions are, as County counsel noted at the September 15 meeting, "very strict, very stringent." (Compl. ¶ 140.) Under ANCA, an airport sponsor can implement an access restriction for Stage 3 aircraft (which is what JSX operates) "only if" it: (i) obtains Federal Aviation Administration ("FAA") approval for the restriction via an extensive regulatory process overseen by the FAA ("Part 161"), or (ii) obtains the unanimous consent of *all* aircraft operators affected by the restriction. 49 U.S.C. § 47524(c)(1). *See Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 138 (2d Cir. 2016). Neither occurred here, rendering the total access restriction invalid.[6]

There can be no dispute that the County is restricting JSX's access to JWA. The County has rejected all of JSX's proposed accommodations. In the November letters, the County made clear that it will not accommodate JSX at any non-SIDA location managed by the County (*e.g*., the terminal, the FIS, etc.). (Compl. ¶¶ 82-85.) It also has prohibited, via the Restriction, JSX from operating out of ACI Jet's FBO. (*Id*. ¶ 140.) The only "option" the County has offered—operating out of the SIDA terminal—is no option at all, as it is expressly counter to federal law *and the County knows that*. In fact, the whole point of the County's Restriction was to eliminate JSX from *JWA*, not just to move it away from ACI Jet. (*Id*. ¶¶ 16, 106.) Therefore, the proposal from the County—that JSX violate federal law, change its

---

[6] To date, no airport has successfully obtained permission from the FAA to impose an access restriction on Stage 3 aircraft via the Part 161 process or otherwise. Under Part 161, a public airport must demonstrate several factors to the FAA, including that the restriction: (i) is reasonable, non-arbitrary and non-discriminatory; (ii) does not create an unreasonable burden on interstate or foreign commerce; (iii) is consistent with maintaining the safe and efficient use of navigable airspace; (iv) does not conflict with a law or regulation of the United States; (v) has been subject to adequate opportunity for public comment; and (vi) does not create an unreasonable burden on the national aviation system. 49 U.S.C. § 47524(c)(2).

1  certification status, or upend its federally approved business model—was

2  intentionally discriminatory and designed to eliminate JSX's convenient, safe, and

3  COVID-friendly service at JWA.  In short, the County unconstitutionally introduced

4  an access restriction that prohibits JSX from operating at JWA.

5      The Second Circuit has addressed an analogous situation where various airport

6  operators sought injunctive relief in order to stop a local airport sponsor from

7  enforcing local laws that restricted the operators' access to the public use airport.

8  The Second Circuit found that the plaintiffs were likely to succeed on their ANCA

9  preemption claim and enjoined the Town from enforcing the local laws.  *Town of E.*

10 *Hampton*, 841 F.3d at 152.  The Second Circuit emphasized that ANCA's procedural

11 requirements—Part 161 or unanimous consent—were mandatory:  "Because

12 [ANCA's] procedures are mandatory and comprehensive, we [] conclude that local

13 laws not enacted in compliance with them (which the Town concedes the Local Laws

14 challenged in this case were not) are federally preempted."  *Id*. at 151-52 (citations

15 omitted).  The Second Circuit unequivocally held that an access restriction is

16 unconstitutional under ANCA unless the sponsor (1) complied with Part 161 or (2)

17 obtained unanimous consent from all affected operators.  *Id*.  at 141.

18     Here, the County has not done either.  *First*, JWA has not obtained FAA

19 approval pursuant to the "very strict, very stringent" Part 161 process.  No airport

20 sponsor has.  In fact, had the County tried to comply with Part 161, it was required

21 to complete a federal notice-and-comment period before the access restriction could

22 go into effect.  14 C.F.R. § 161.303(a).  This never happened.  *Second*, this lawsuit

23 demonstrates that all affected operators have not consented (in fact, the only affected

24 operator, JSX, has been protesting this from the outset).  Therefore, the access

25 restriction is preempted by ANCA.  *See Town of E. Hampton*, 841 F.3d 133; *see also*

26 *Clay Lacy Aviation v. City of L.A.*, 2001 WL 1941734, at *3 (C.D. Cal. July 27, 2001).

27     As a last ditch effort, the County may argue that (1) the Restriction is

28 permissible because it is approved under the Access Plan and therefore (2) the Access

Plan is "grandfathered" under ANCA.  (*See* Compl. ¶ 165.)  Noise and access restrictions that were in effect prior to the enactment of ANCA—circa 1990—are "grandfathered' and permitted to remain in effect.  49 U.S.C. §47524(d).  But under ANCA, any such grandfathered access restriction cannot be modified *if it reduces or limits aircraft operations*.  *See id*. (stating that an "amendment to an airport noise or access agreement or restriction [shall] not reduce or limit aircraft operations").[7] Given that the Restriction both amends the Access Plan and limits JSX's operations—in fact it eliminates JSX's operations—JWA's Restriction is invalid.

It is indisputable that the Access Plan grants the County the discretion to allow "Qualified Commuter Carriers" like JSX to operate at an FBO:

> Any Qualified Commuter Carrier may apply to the Airport Director . . . for permission to conduct passenger . . . operations at the location of a [FBO].  If the Airport Director or the Board of Supervisors authorizes Commuter Carrier operations at a FBO location, the authority of the applicant to conduct such operations shall be subject to such conditions as the Airport Director or the Board may impose on such operations.[8]

However, the Restriction removes this discretion by prohibiting JSX's operations at the FBO altogether:   an impermissible modification.   49 U.S.C. §47524(d).  Indeed, the County's letter terminating JSX's license to operate at JWA cited the Restriction as a basis: "This restriction prevents JSX from conducting passenger or related operations at the location of an FBO . . . "  (Wilcox Decl. ¶ 76, Ex. G.)

All of this is to say, if the County argues that the Restriction is grandfathered, the argument is squarely rejected by ANCA.  49 U.S.C. §47524(d).  To the extent the County argues that its Access Plan gives the Airport discretion to enforce the Restriction, the Airport's refusal to accommodate JSX's non-SIDA operation is not

---

[7] *See* Airport Compliance Manual, FAA Order 5190.6b, § 13-15 ("airport sponsors may amend [grandfathered] restrictions without complying with ANCA *provided the amendment does not reduce or limit aircraft operations* or affect aircraft safety").
[8] Access Plan § 8.1.7.

set forth in the Access Plan and, in any event, preempted by federal law (*see infra*). Plaintiffs are likely to succeed on their ANCA preemption claim.

### b.   Airline Deregulation Act ("ADA") Preemption

Plaintiffs similarly have a likelihood of success under the ADA.  The ADA was enacted to enhance "the availability of a variety of adequate, economic, efficient, and low-priced services," 49 U.S.C. § 40101(4), and to "encourag[e] entry into air transportation markets by new and existing air carriers and the continued strengthening of small air carriers to ensure a more effective and competitive airline industry," *id*. § 40101(13).  Under the ADA, "a State [or a] political subdivision of a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, *route*, or *service* of an air carrier[.]"  49 U.S.C. § 41713(b)(1) (emphases added).

Local conduct is "related to" a price, route, or service if it has "a connection with" or "reference to" a price, route, or service.  *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 223 (1995) (citation omitted); *Air Transp. Ass'n of Am. v. City & Cnty. of S.F.*, 266 F.3d 1064, 1070-71 (9th Cir. 2001).  "Services" refer to "the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided."  *Air Transp. Ass'n*, 266 F.3d at 1070-71 (citation omitted).  Notable here, "services … include[s] items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself."  *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995) (en banc); *Arapahoe Cnty. Pub. Airport Auth. v. FAA*, 242 F.3d 1213, 1216 (10th Cir. 2001) (same).  "Rates" and "routes" refer to the point-to-point transport of customers.  "Rates" indicates price; "routes" refers to courses of travel.  *Id*.  The County's elimination of JSX from JWA necessarily eliminates certain federally authorized and publicly beneficial "routes" and "services" in violation of the ADA.  In addition, the County's determination to force JSX to operate from the JWA terminal without accommodating its non-SIDA operations also violates the ADA because the Airport

purports to regulate boarding and baggage handling procedures that constitute services within the scope of the ADA. *See id.*

The only exception to the ADA's broad preemptive effect is that a sponsor retains limited "proprietary powers and rights." 49 U.S.C. § 41713(b)(3). This "proprietary right exception" is very narrowly interpreted. *See, e.g.*, *S.F. v. FAA*, 942 F.2d at 1395, 1395 n.2; *Clay Lacy*, 2001 WL 1941734, at *2. A proprietary power and right can take many shapes (*e.g.*, determining lease rates), but it always must be "reasonable, nondiscriminatory, nonburdensome to interstate commerce, and designed not to conflict with the ADA and its policies." *Arapahoe Cnty.*, 242 F.3d at 1216; *see also British Airways Bd. v. Port Auth. of N.Y.*, 564 F.2d 1002, 1011 (2d Cir. 1977); *S.F. v. FAA*, 942 F.2d at 1394 ("Congress made it clear, however, that the power delegated to airport proprietors to adopt [local] regulations is limited to regulations that are not unjustly discriminatory."). The determination whether local regulations are justified by the local proprietor exception is left to the sole province of the FAA. *See Arapahoe Cnty.*, 242 F.3d at 1216. The FAA has not made such a finding and the proprietary right exception does not apply.

The Tenth Circuit's decision in *Arapahoe County* demonstrates the problems with the County's elimination of JSX from JWA. In that case, the Tenth Circuit found that the airport sponsor's ban of all scheduled air carrier service violated the ADA and was preempted. *Arapahoe Cnty.*, 242 F.3d at 1224. *First*, the Tenth Circuit found that the ban was related to both "services" and "routes": "By banning scheduled passenger service, the [airport sponsor] has affirmatively curtailed an air carrier's business decision to offer a particular service in a particular market" and thereby it "significantly impacts the scope of services available to public citizens desiring to travel by air from [the airport]." *Id.* at 1222. Moreover, the effect of the airport sponsor's "ban further extends to route determinations because the air carrier cannot conduct regular operations over any route involving the banned airport." *Id.*

*Second*, in regard to the proprietary right exception, the Tenth Circuit

"recognized that local proprietors play an *extremely limited role* in the regulation of aviation." *Id*. at 1222-23 (citation omitted) (emphasis added).  According to the Court, the proprietary right exclusion does not permit an airport sponsor to regulate (indirectly or otherwise) an air carrier's routes or services, *even if shrouded in terms of safety of efficiency*. *Id*.

*Third*, the Tenth Circuit determined that the airport sponsor was unreasonable when it attempted to exercise its proprietary powers. *Id*. at 1224.  Notably, the Tenth Circuit found dispositive that two aircraft operators could engage in identical conduct, but one would be banned and the other permitted simply because of the sponsor's local rules. *Id*. at 1223-24.  The Court made clear that such an arbitrary line-drawing exercise is invalid under the ADA.

Here, the County's conduct—prohibiting JSX from accessing JWA by unlawfully funneling it through a SIDA terminal through which JSX customers cannot pass—violates the ADA.  It prevents JWA from offering routes and services that it otherwise would provide.  Specifically, JWA operates, or will operate in 2021, routes that connect the following cities from JWA:  Las Vegas, Oakland, Phoenix, Reno, Mammoth Lakes, Napa, Concord, and Palm Springs.  (Wilcox Decl. ¶ 86.)  At all of these airports, JSX operates from a non-SIDA portion of the airport so JSX's services will be terminated if the County's Restriction is not enjoined.  (Compl. ¶ 24.)  Moreover, because Mammoth Lakes and Concord, for example, lack TSA screening facilities, the access restriction prohibits any type of regular air service between those airports and JWA altogether.[9]  (Wilcox Decl. ¶ 93.)  Similarly, JSX's aeronautical *services*—safe, economical, on-demand, crowd-free, and socially distanced flights—will be terminated.  The ADA preempts this local regulation.

The County's insistence that JSX operate only from the JWA's SIDA terminal also violates the ADA.  (Compl. ¶ 4, 82-85, 104.)  By forcing JSX to abandon its

---

[9] The County's "option" for JSX violates the ADA as well.  JSX connects JWA with airports such as Mammoth Lakes and Concord that do not have SIDA locations.  As a result, the County's "option" terminates JSX's ability to offer routes and services that are otherwise fully compliant with federal law. (*See* Compl. ¶¶ 82-85.)

federally approved non-SIDA security protocol as a condition of operating at JWA, the Airport would force changes to JSX's operations, including "such items as … boarding procedures . . . and baggage handling" within the scope of the ADA's definition of "services." *Arapahoe Cnty.*, 242 F.3d at 1216 (quoting *Hodges*, 44 F.3d at 336). The ADA expressly preempts such local regulation of services. *Id.* Due to the County's conduct, JSX's routes or services are being improperly regulated in violation of the ADA where the federal government has preempted the field.

Even assuming that the County attempts to invoke the proprietary right exception, such an argument fails because the County is (1) acting unreasonably and discriminatorily; (2) imposing a significant burden on JSX and others; and (3) contradicting the language and goals of the ADA. *See S.F. v. FAA*, 942 F.2d at 1395. Indeed: (1) the County has failed to provide JSX an accommodation that permits JSX to offer routes and services consistent with its federally approved operating status and the County has expressly stated that it passed the Restriction to eliminate JSX from JWA; (2) the County's conduct significantly impacts JSX as well as several third parties, such as JSX's customers, employees, and other airports (in so doing, at times affecting interstate commerce); and (3) the County is attempting to regulate air transportation generally by eliminating or forcing changes to *all* of JSX's routes and services at JWA. This is arbitrary and does not fit within the "narrow" proprietor exception. *See Arapahoe Cnty.*, 242 F.3d at 1223. Plaintiffs are likely to succeed on this claim.[10]

**2.      The County's Restriction is Discriminatory – Count III**

Plaintiffs are also likely to prevail on the merits of their Equal Protection claim.

---

[10] The County is also violating its Grant Assurance obligations, yet another reason the discriminatory access restriction is invalid. *See, e.g.*, *Arapahoe Cnty.*, 242 F.3d at 1220 (finding local regulation preempted by Grant Assurance 22(a)). JSX will pursue these arguments in proceedings before the FAA. *See* 14 C.F.R. § 16.1(a)(6).

The Equal Protection Clause, enforceable pursuant to 42 U.S.C. § 1983[11], provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Fourteenth Amendment "requires that all persons subjected to . . . legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602 (2008) (citation omitted).

This Court must determine whether "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) (collecting cases). Despite rational basis review typically being a mere formality for governmental action, the County's political favoritism shown to airlines at the expense of JSX does not pass muster. Under this analysis, the County may not draw lines for the purpose of arbitrarily excluding JSX. *See Merrifield v. Lockyer*, 547 F.3d 978, 991-92 (9th Cir. 2008) (holding that state action excluding certain workers from an exemption was not rationally related to a legitimate government interest). Regulations that exclude a group to placate or procure the political support of powerful constituents do not satisfy rational basis review. *See, e.g.*, *Fowler Packing*, 844 F.3d at 815-16 (holding that a regulatory exclusion designed "to procure the support of [a third party constituent]" did not satisfy rational basis review).

To date, Defendants have not provided any basis, justification, or reason for requiring the new Restriction or otherwise wholly excluding JSX from JWA. (Wilcox Decl. ¶ 79.) The County's decision to ban JSX is nothing more than an act of political favoritism—an attempt to attract more airlines to provide service at JWA's SIDA terminal (and pocket the associated revenue). The timing of Spirit, Allegiant, and Southwest's new routes and services at JWA is not a coincidence. Apparently, the quid-pro-quo between the County and the airlines required that JSX

---

[11] The County and Rondinella are both "persons" for purposes of § 1983. *See Womack v. Cnty. of Amador*, 551 F. Supp. 2d 1017, 1026 (E.D. Cal. 2008).

be eliminated in exchange for the airlines offering routes and services at JWA. This anticompetitive, political favoritism does not pass rational basis review. *See Fowler Packing*, 844 F.3d at 815-16 (politically-motivated exclusion "would not survive even rational basis scrutiny"); *Bekele v. Ford*, 2011 WL 4368566, at *8 (N.D. Cal. Sept. 17, 2011) (finding no rational basis where "bigger players" were favored).

Moreover, JSX *knows* that the County passed the Restriction, and has refused to accommodate JSX, with the intent of eliminating JSX from JWA. (Borgsmiller Decl. ¶¶ 10-11.) Rondinella made clear in discussions with JSX's CEO and one of ACI Jet's owners that the focus of the Restriction was to exclude JSX from JWA. (Compl. ¶¶ 16, 32, 104.) Rondinella also told ACI Jet's owner that ACI Jet would not be awarded a renewed lease unless it refused to allow JSX to operate at ACI Jet. (*Id*. ¶ 57.) It is only JSX that is affected; it is only JSX that is banned; and it is only JSX that has to shoulder the illegitimate burden of the County's goal of attracting more airlines at JWA. Plaintiffs are likely to prevail on this claim.

### C.    An Injunction is Necessary to Prevent Irreparable Harm

If JSX is not provided a reasonable accommodation, it will suffer irreparable harm. *First*, a constitutional violation is *per se* irreparable harm. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 994-95 (9th Cir. 2017) (citations omitted);*see also* 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed., 2020) ("When an alleged deprivation of a constitutional right is involved . . . no further showing of irreparable injury is necessary.").

*Second*, if the Restriction takes effect, Plaintiffs will suffer "harm for which there is no adequate legal remedy." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). The lack of any reasonable accommodation threatens Plaintiffs' continued existence. (Compl. ¶¶ 4, 32.) JWA is one of JSX's largest markets representing 35% of JWA's customer base. (Wilcox Decl. ¶¶ 9, 85, 86.) Without injunctive relief, Plaintiffs' loss will be crippling. JSX's business is capital

intensive where economies of scale are important.  (*Id.* ¶ 86.)  The instant shock of a loss of a major market that JSX has spent 3 years developing threatens the long-term viability of JSX's services.  (*See* Compl. ¶¶ 110, 185, 199; Wilcox Decl. ¶¶ 86-87.)  This is irreparable harm.  *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931-32 (1975) (a "substantial loss of business and perhaps even bankruptcy" absent preliminary injunctive relief shows "irreparable injury . . . for otherwise a favorable final judgment might well be useless").

*Third*, the Restriction will cause incalculable and irreversible damage to Plaintiffs' goodwill, relationships, and reputation if it is forced to cancel flights.  (Wilcox Decl. ¶¶ 89-92.)  Absent immediate injunctive relief, every JSX customer's itinerary would change, and chaos and customer confusion would be sure to result.  Wilcox Decl. ¶ 32.  Some customers who obtain refunds may be unable to purchase a new flight at a comparable fare, and some dislocated customers would be prevented from traveling altogether.  *Id.*  The resulting online reviews and adverse press will cause incalculable damage to JSX's goodwill, which is irreparable harm.  *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.").

JSX's harm is real, irreparable, and avoidable.  The County faces *no prejudice* with a return to the *status quo ante*.  JSX has operated safely out of JWA for years and ACI Jet remains willing to partner with JSX into 2021 and onward.  (Compl. ¶¶ 51, 53, 60, 93.)  Moreover, there are numerous other ways that JWA can accommodate JSX in an efficient and federally compliant manner.  Simply put, JSX will be irreparably harmed if the Restriction is not enjoined.

## D.  The Public Interest and Equities Strongly Favor an Injunction

Where, as here, the government is a party, the last two factors of the inquiry merge.  *Drakes Bay Oyster Co.*, 747 F.3d at 1092.  "[B]y establishing a likelihood that [the government's] policy violates the U.S. Constitution," as Plaintiffs have here,

they "have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act Coal.*, 757 F.3d at 1069. This should end the Court's inquiry.

When balancing the equities, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). Allowing the unlawful access restriction to stand will result in the elimination of JSX's access to JWA, the rejection of JSX's federally approved and TSA-compliant business model, and very likely the financial destruction of JSX as a company. (Wilcox Decl. ¶¶ 9, 89.) Moreover, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citations omitted).

Absent preliminary relief, Plaintiffs' customers will suffer a loss of access to JWA and all the non-SIDA locations at various cities it serves on flights to and from JWA, as well as the access to convenient and crowd-free flying. (Compl. ¶ 27.) More than 5,500 travelers to and from JWA contacted the County as a result of the illegal Restriction and dozens appeared at the County Board meeting on September 15, all expressing that they prefer to fly on JSX. (*Id.* ¶¶ 40, 89, 112, 134.) Plaintiffs' crowd-free and affordable services have been particularly crucial during the current pandemic, as thousands of customers have made clear that they will not fly any other way until there is a vaccine. These travelers made clear that JSX's crowd-free service was imperative to their ability to fly during this pandemic, including because they were immunocompromised, a first responder, a caretaker, or a medical professional. (*See id.* ¶¶ 34, 40; Wilcox Decl. ¶ 39, Ex. A.) Similarly, other airport sponsors and community groups have made clear that JSX's convenient, non-SIDA short haul service is integral. (*Id.* ¶¶ 94-100, Exs. H-K.) Whether because airlines cannot (or will not) serve the small airport and surrounding community; the practicalities of people choosing to travel where it is convenient; because JSX provides medically

necessary "Angel Wings" flights; or otherwise, it is clear that JSX's services are fundamental to the public.  (*Id*. ¶¶ 39, 103, Exs. A, L.)

In addition, the County itself will be deprived of the economic benefits of JSX's operations.  Currently, JSX's operation at JWA directly employs more than 50 individuals who live in or near the County, and hundreds of additional jobs are supported indirectly.  (Compl. ¶¶ 25, 110, 150; Wilcox Decl. ¶ 88.)

### E.    The Bond Should be Waived

Given the rights at stake in this case, the Federal Rule of Civil Procedure 65(c) bond should be waived.   "[T]o require a bond would have a negative impact on plaintiff's constitutional rights, as well as the constitutional rights of other members of the public affected . . . ."  *Baca v. Moreno Valley Unified Sch. Dist*., 936 F. Supp. 719, 738 (C.D. Cal. 1996) (citation omitted).   Additionally, there is no chance of harm to the State.  *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). "[R]equiring a bond to issue before enjoining potentially unconstitutional conduct by a governmental entity simply seems inappropriate, because . . . protection of those rights should not be contingent upon an ability to pay."  *Bible Club v. Placentia-Yorba Linda Sch. Dist.*, 573 F. Supp. 2d 1291, 1302 n.6 (C.D. Cal. 2008) (citation omitted).  A bond is neither appropriate nor necessary in this case.  Plaintiffs seek only to return to the status quo, which will increase money for JWA and the County.

### IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully—but urgently—request that this Court enter a temporary restraining order consistent with the contemporaneously filed proposed order and grant any other relief this Court deems just and equitable.

1  Dated:      December 14, 2020      Respectfully submitted,

2

3

4                                    By:/s/William V. O'Connor
                                         William V. O'Connor

5                                    Attorneys for Plaintiffs Delux Public Charter,
                                     LLC d/b/a JSX Air and JetsuiteX, Inc.

6

7                                    BRIDGFORD, GLEASON & ARTINIAN
                                     Richard K. Bridgford (CA SBN 119554)
8                                    Richard.Bridgford@Bridgfordlaw.com
                                     Michael H. Artinian (CA SBN 203443)
9                                    Mike.Artinian@Bridgfordlaw.com
                                     26 Corporate Plaza, Suite 250
10                                   Newport Beach, CA 92660
                                     Telephone:  (949) 831-6611
11                                   Facsimile:   (949) 831-6622

12

13                                   COOLEY LLP
                                     William V. O'Connor (CA SBN 216650)
14                                   woconnor@cooley.com
                                     4401 Eastgate Mall
15                                   San Diego, CA  92121-1909
                                     Telephone:  (858) 550-6000
16                                   Facsimile:  (858) 550-6420

17

18                                   COOLEY LLP
                                     J. Parker Erkmann (*Pro hac vice* to be filed)
19                                   perkmann@cooley.com
                                     1299 Pennsylvania Avenue, NW, Ste 700
20                                   Washington, DC 20004-2400
                                     Telephone:  (202) 776-2036
21                                   Facsimile:   (202) 842-7899

22                                   *Attorneys for Plaintiffs*

23

24

25

26

27

28