1  BRIDGFORD, GLEASON & ARTINIAN
   Richard K. Bridgford (CA SBN 119554)
2  Richard.Bridgford@Bridgfordlaw.com
   Michael H. Artinian (CA SBN 203443)
3  Mike.Artinian@Bridgfordlaw.com
   26 Corporate Plaza, Suite 250
4  Newport Beach, CA 92660
   Telephone:  (949) 831-6611
5  Facsimile:  (949) 831-6622

6  COOLEY LLP
   William V. O'Connor (CA SBN 216650)
7  woconnor@cooley.com
   4401 Eastgate Mall
8  San Diego, CA  92121-1909
   Telephone:  (858) 550-6000
9  Facsimile:  (858) 550-6420

10 COOLEY LLP
   J. Parker Erkmann (*Pro hac vice* to be filed)
11 perkmann@cooley.com
   1299 Pennsylvania Avenue, NW, Ste 700
12 Washington, DC 20004-2400
   Telephone:  (202) 776-2036
13 Facsimile:  (202) 842-7899

14 *Attorneys for Plaintiffs Delux Public Charter, LLC*
   *d/b/a JSX Air and JetSuiteX, Inc.*
15

16              **UNITED STATES DISTRICT COURT**

17     **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

18 DELUX PUBLIC CHARTER, LLC D/B/A
   JSX AIR AND JETSUITEX, INC.,          Case No. 8:20-cv-02344
19
                                Plaintiffs, **DECLARATION OF ALEX WILCOX**
20 v.                                      **IN SUPPORT OF PLAINTIFFS' *EX***
                                           ***PARTE* APPLICATION FOR**
21 COUNTY OF ORANGE, CALIFORNIA, a         **TEMPORARY RESTRAINING**
   charter county; BARRY RONDINELLA in his **ORDER AND ORDER TO SHOW**
22 official capacity as Airport Director of John **CAUSE WHY PRELIMINARY**
   Wayne Airport,                          **INJUNCTION SHOULD NOT ISSUE**
23
                                Defendants.
24

25

26

27

28

I, Alex Wilcox, declare as follows:

1.     I am the Chief Executive Officer for Plaintiff Delux Public Charter, LLC d/b/a JSX Air ("JSX") and the Chief Executive Officer for Plaintiff JetSuiteX, Inc. ("JetSuiteX"; collectively with JSX, "Plaintiffs").   This declaration is made in support of Plaintiffs' *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause Why Preliminary Injunction Should Not Issue, and the supporting documents filed therewith.  I have personal knowledge of the facts set forth herein and, if called upon to testify, could and would testify competently thereto.

2.     JSX is a Federal Aviation Administration ("FAA")-certified, on-demand air carrier that operates commercial flights pursuant to 14 C.F.R. § 135 and holds a Commuter Air Carrier Authorization issued by the United States Department of Transportation ("DOT").  JSX has flown over one million people among dozens of airports since it was certified five years ago.  Since June 2018, JSX has served John Wayne Airport ("JWA" or "Airport").  JSX has filed this action to prevent the illegal access restriction imposed by Airport sponsor Orange County ("County") that would prohibit JSX from serving JWA from going into effect.

3.     Plaintiff JetSuiteX is an indirect air carrier that has authority from the DOT under 14 C.F.R. § 380 to sell individual seats to the public on flights.  JetSuiteX sells tickets to the traveling public, charters an entire JSX flight, and then JSX operates the flight using the time, location, and destination designated by JetSuiteX.

4.     JSX is federally categorized as an essential service.

5.     Thousands of JSX customers rely on JSX's uniquely crowd-free service to travel safely during the pandemic.

6.     Such travel is often for critical purposes including safely travelling to develop and distribute drugs to fight Covid-19; safely traveling to provide front line health care in critically hit areas; safely traveling to fight forest fires; and safely travelling to receive health care.

7. At the time of this writing, Orange County is experiencing an all-time surge in COVID related hospitalizations.

8. Removing access for JSX would immediately and irreparably harm those who rely on JSX to combat, avoid, or address the pandemic, and all those who are relying on them, among others.

9. The air transportation industry (like the auto, steel or utility business) have high capital costs, which serve as a barrier to entry for newer firms like JSX. In short it is very difficult to create and sustain a successful business model in the air transportation industry. It takes a massive amount time, money and capital to build the business and the customer base before the airline becomes and can stay profitable. In addition, due to the issues of safety and reliability, it also takes a great deal of money, time and staff to build a reputation and to keep the goodwill of a loyal customer base. The old adage that "goodwill is won by many acts and lost by one" applies here. JWA's access restriction, as it eliminates JSX service from JWA, is the one act that can destroy the market share, goodwill and customer base JSX has spent years and millions of dollars developing. JSX has spent years developing that model based on its faster, safer and more convenient federally approved non-SIDA security protocol. However, the County and JWA's access restriction, without any reasonable accommodations being offered despite repeated feasible requests by JSX, will wipe out all that work in a single precipitous blow. JWA's access restriction is targeted to completely eliminate JSX's service to and from JWA and with it 35% of its revenues, countless jobs and any goodwill JSX has developed over the years (and with it a devoted customer base). When all the flight arrangements of JSX's customers are thrown into total chaos, JSX will suffer such a reputational so that I, based on my extensive experience in the aviation industry, do not believe any air carrier could recover from. As this is a competitive industry, these customers will immediately go elsewhere. If the access restriction is not enjoined, JSX will never be able to win back the majority of them. As such a later legal remedy will be ineffectual to JSX if

this action is not enjoined immediately and JSX restored to the status quo.  While JWA's action will already have crippled JSX's business, preserving the status quo will actually benefit JWA in these revenue strapped Covid times, not hurt JWA. Orange County is attempting to regulate the routes and services of JSX.  That is an area only the federal government may regulate.  Under the access restriction, JSX would no longer be allowed to bring customers to JWA's Fixed Base Operators ("FBO") from many of the airports it serves.  The County's access restriction regulates (in fact, eliminates) a route, and under the Airline Deregulation Act ("ADA"), among other federal statutes, the County has no authority to do that.

10.   Moreover, if JSX were forced to operate from the JWA terminal without a reasonable accommodation for its operations, the County (as opposed to a competent and authorized federal authority) would be dictating to JSX how to perform its own ticketing, baggage, boarding and other services.  Not only would such a requirement bring JSX to the lowest common denominator and defeat JSX's many innovations, such regulation of "services" is preempted by the ADA, case law and precedent that define services broadly to include, among other things, the ticketing, boarding and baggage handling performed by air carriers.

11.   JSX operates compliant with all Part 135 regulations and JetSuiteX operates compliant with all Part 380 regulations.

12.   JSX's operations are provided for and fully compliant with federal law. They are structured differently and provide a different type of service than the major scheduled airlines.

13.   I founded JSX in the great American tradition of building a better mousetrap. I have been personally involved with innovative, consumer friendly companies throughout my career.  I was in charge of U.S. product development for innovative and customer acclaimed air carrier Virgin Atlantic Airways in the 1990s. I was the first employee of innovative and customer acclaimed air carrier JetBlue Airways, where I helped introduce LiveTV for the first time ever on a major air

carrier.  I also led JetBlue's Product Development and Airport Service departments at various times.

14.     JSX serves a massive and underserved need for quick, efficient, safe, affordable and pleasant air transportation to markets in a manner that is faster and safer than driving.

15.     JSX focuses on short-haul air travel, service for which has shrunk dramatically over a 20-year period as airport terminals became more like crowded, overpriced and fortified shopping malls designed more to capture consumers than to get them on their way.

16.     JSX is a "hop-on" jet service, founded on the notion that consumers should not have to spend two to three hours at a crowded airport in order to board a 45-minute flight.  JSX is designed to provide a fast, crowd-free airport experience.

17.     The overwhelmingly positive consumer response and huge consumer demand for our services has enabled JSX to double in size each year of its existence.

18.     JSX's federally provided for certification status and its Transportation Safety Administration ("TSA") approved "Twelve-Five" Security Plan and business model require it to drop-off and pick-up customers at locations that are not the Security Identification Display Areas ("SIDA").

19.     A SIDA location requires everyone who is permitted access to pass through a TSA-security checkpoint.  TSA checkpoints—the crowds, frustration, and delays associated with them—are ubiquitous for the average traveler.

20.     JSX's service operates pursuant to a federal TSA program that requires its customers to undergo different (not lesser) security processes.  Those federally required processes allow the JSX customer to bypass large crowds and long lines, and bypass the typical time spent waiting for an airplane to board and depart.  To ensure the highest levels of safety and security, JSX has adopted and implemented security protocols that *exceed* TSA requirements.  In fact, JSX achieved additional authority from the TSA to screen all passengers with certain weapons and explosives

detection technology not in use by any other air carrier. Additionally, to my knowledge JSX is the only Part 135 air carrier authorized by TSA to participate in the TSA "Secure Flight" program used by TSA to vet all passengers who book tickets on any and all major U.S. air carriers against various government-maintained watch lists to identify potential security threats.

21.   JSX's operations are regularly audited by the TSA nation-wide, and JSX routinely passes those audits with no adverse findings. Several TSA auditors have said that JSX is the most competently and professionally run organization they audit.

22.   Under applicable regulations and its TSA-approved security plan, JSX must operate (and has for several years incident free, at every one of its airports) by providing access from non-SIDA portions of airports, such as FBOs and public and private hangars, terminals and leaseholds.

23.   This does not mean, as has been suggested during some Orange County Board of Supervisors (the "Board") proceedings, that JSX's operations are less secure than major airlines. Small is beautiful when it comes to safety and security. Simple systems and small groups are much easier to secure and operate than complex systems involving thousands of individuals.

24.   For example, when a JSX aircraft touches down at JWA, only JSX personnel may access the cabin. Unlike the major airlines preparing an aircraft for its next flight, JSX does not allow third party cleaners, third party mechanics or third party caterers on board. And each and every JSX customer is screened for weapons and explosives and checked against the TSA watchlist and the national security databases through TSA's Secure Flight program. All JSX aircraft feature the exact same armored cockpit doors that the major air carriers have installed.

25.   There is no compromise on safety and security at JSX. It is a fact, not marketing pablum: JSX doesn't just meet, but far exceeds industry standards and federal requirements.

26.   JSX's customers are federally prohibited from accessing JWA's

terminal SIDA areas due to the federal regulatory scheme, distinguishing between the customers who access through its non-SIDA site as opposed to the main terminal's SIDA site.

27.     This allows JSX, among other things, to provide service at any of the hundreds of U.S. airports that do not have a TSA checkpoint, such as Concord and Napa, California.

28.     Like all U.S. airports, JWA has the option, the ability, and the legal requirement to provide a non-SIDA operating area in the terminal, at an FBO, or at any other suitable airport facility leased or licensed or sublet to JSX.  Unlike other U.S. airports, JWA has obstinately refused to do so.  The Airport has said that JSX can only operate from the JWA terminal, which is a SIDA site, but refused to grant any accommodation for JSX's non-SIDA operations.  In doing so, the Airport is requiring JSX to change its operation to a SIDA operation and dictating how JSX performs such services as boarding its passengers and performing baggage handling.  Such regulation of services by a local authority is expressly preempted by the ADA.

29.     JWA says its terminal is not suited for non-SIDA operations.  Yet it routinely allows such operations for sports, government and VIP charters.  JWA dismissed without discussion or exploration no fewer than five alternatives proposed by myself and my senior leadership and operating teams to accommodate JSX at the JWA terminal.

30.     JWA's obstinate refusal to even discuss let alone provide reasonable accommodation, combined with its unilateral decision to prohibit JSX operations at FBOs effective January 1, 2021, together operate to unreasonably and illegally banish JSX's access to JWA.

31.     This refusal to allow access creates immediate and irreparable harm not only to JSX but also to the thousands of JSX customers.  If the County succeeds in forcing JSX from JWA, every JSX customer's itinerary would change, and chaos and customer confusion would be sure to result.  Some customers who obtain refunds

may be unable to purchase a new flight at a comparable fare, and some dislocated customers would be prevented from traveling altogether.  The resulting online reviews and adverse press will cause incalculable damage to JSX's goodwill. Moreover, customers rely on JSX to travel safely during the pandemic, often for indisputably critical purposes including developing drugs to fight Covid, providing or receiving health care, and fighting forest fires.  The damage JWA is attempting to inflict on JSX would be immediate, severe and unrecoverable.

32.     A key part of JSX's convenience and innovation results from its ability to screen and board its customers (a maximum 30 per flight) much more rapidly than the larger air carriers who process hundreds of customers per flight and are required to operate from the SIDA portions of the terminal (including the TSA checkpoints).

33.     JSX service thus provides its customers with a much more rapid, socially distanced way to board and travel:  no large groups waiting to pass through security; no large groups waiting to board; and no large groups waiting to retrieve baggage.  This is exactly the kind of innovation and customer convenience that the ADA was designed to produce.

34.     Because of this and other customer-centric efforts, JSX was awarded the 2020 Regional Passenger Choice Award for "Best Overall" air carrier in North America by the Airline Passenger Experience Association ("APEX").  JSX was also named by Fast Company as one of the world's "Most Innovative Companies for 2020," ranked within the top 5 in the travel category.  In addition, JSX routinely achieves a Net Promoter Score ("NPS")[1] in the mid-80s and 90s, which is roughly double the average NPS score of other air carriers at JWA.

35.     In contrast, Spirit Airlines ("Spirit") ranked the lowest on the Airline Customer Satisfaction Index for the past five years.  Spirit also ranked eighth out of ten in the 2020 Airline Quality Rating.  Spirit ranked last on J.D. Power's 2020 North

---

[1] An NPS is a reflection of how likely a customer is likely to recommend a product or service to a friend or colleague.

America Airline Satisfaction Study Overall Customer Satisfaction Index ranking for long-haul flights, and third to last for short-haul flights.  Spirit has never won a Passenger Choice Award from APEX.

36.     JWA terminated JSX's license to operate within 48 hours of announcing Spirit's entry into JWA.

37.     The relative safety and other advantages of JSX's service have only grown during the pandemic as a result of the type of service JSX provides in its security screening and on its flights.

38.     Thousands of customers have told JSX that it is the only carrier they will fly until the pandemic subsides.  Representative samples of these customer statements are attached as Exhibit A, and excerpted as follows:

- "I'm trying to understand why JSX is being kicked out of SNA.  My wife has MS and it's the only airline she feels comfortable riding IN A PANDEMIC."

- "I use JSX … to fly to Orange County to see medical specialists, I have autoimmune disease and CANNOT fly commercial airlines due to COVID."

- "It is the only airline that I feel safe flying during this Covid pandemic. I need to travel to help care for my mother who is battling cancer."

- "Until you have an autoimmune disease and a family member with disabilities, you never fully appreciate the safety and comfort of JSX."

Nevertheless, in the face of overwhelming public support, the County has chosen to terminate JSX's license to operate its type of service at the Airport.

39.     JSX has been operating its unique type of service for the public's benefit since 2016 and at JWA since June 2018.

40.     In June 2018, JWA issued JSX a license to operate its unique and highly rated service from an FBO located at the Airport, Aviation Consultants, Inc. d/b/a ACI Jet ("ACI Jet").

41.    The currently in effect lease between ACI Jet and the County does not contain any terms prohibiting JSX's type of service or operations from ACI Jet's facility.

42.    Among other things, JSX rents space and purchases fuel from ACI Jet.

43.    ACI Jet provides a location for JSX's customers to access JWA and to board and deplane JSX flights.  In so doing, ACI Jet facilitates JSX's faster and safer TSA-approved security protocols before any customer is permitted to board a JSX flight.

44.    JSX has never had an accident at JWA or anywhere else.

45.    In five years, JSX has operated over 49,000 flights and boarded over one million customers while maintaining an exemplary safety, security and operational history and reputation with DOT, FAA and TSA.

46.    JSX is also the most "neighborly" commercial air carrier at JWA. Studies have shown that JSX operates the quietest commercial aircraft serving JWA, and JSX has worked with the FAA to implement flight procedures that minimize the negative impacts of noise on the neighboring communities.

47.    There has been testimony before the Board incorrectly claiming that JSX presents a noise issue to the community.  Nothing could be further from the truth.  JSX in fact operates the absolute quietest jet aircraft at JWA.  An independent study commissioned in 2019 demonstrated that JSX aircraft flying a special JSX developed flight path generates 1/36 the noise of a typical B737-800 that operates at JWA.   A true and correct copy of the noise study is attached as Exhibit B.  In other words, it takes 36 JSX flights to generate the same noise as a single large airline aircraft.  Even flying the same path as the big guys, JSX aircraft produce 1/6 the noise energy of a B737-800.  Any assertion that JSX causes a noise problem at JWA is a fabrication, a red herring and not supported by empirical data.

48.    JSX has paid over $13.2 million to operate at JWA, including $8.8 million in rent, fuel, passenger facility charges, landing, and other fees paid at the

Airport, in developing its unique and highly popular type of service and differentiating itself from the competition to the benefit of the public as well as its shareholders.

49.   JSX estimates that the local economic impact of its flight operations is $25 million annually.

50.   On August 19, 2020, while JSX was providing exactly the type of unique service described above and without complaint relative to it, JWA's Airport Director, Defendant Barry Rondinella, sent a letter inviting JSX and other commuter air carriers to request customer allocations under the Access Plan for 2021.  A true and correct copy of the letter is attached as Exhibit C.

51.   On September 11, 2020, JSX submitted its timely request for an allocation of 95,070 customers for 2021.  A true and correct copy of JSX's request is attached as Exhibit D.  This is the same number of customers that JSX had requested, and JWA had approved, for both 2019 and 2020.

52.   On September 11, 2020, I had a conversation with Mr. Rondinella. During our conversation, Mr. Rondinella advised me that he was requiring a new term in the FBO leases that would prohibit JSX from operating at JWA in providing the unique and popular service described above (the "Access Restriction").

53.   During the September 11, 2020 conversation, I advised Mr. Rondinella that the Access Restriction (that had been proposed but not yet approved) would force JSX out of the ACI Jet facility and deny access to JSX service at JWA.  I asked that JSX's service be accommodated with access at another location at the Airport.

54.   In an attempt to find a way to accommodate JSX's services at JWA, I renewed a request that JSX has previously made that JWA convert an under-utilized portion of the terminal or terminal ramp and parking area into a non-SIDA area to accommodate access to JSX's unique and highly rated service operation.  The request was summarily denied by Mr. Rondinella.  I said to him "it sounds like JWA is trying to eliminate JSX operations."  He replied, "It is what it is."

55.     I also offered, again, to access and to operate out of a number of unused buildings at JWA, convert space to be compliant with its non-SIDA operations, or bus JSX's customers from the FBO to a different loading area for customer pick-up and drop-off.

56.     In addition, I proposed to access and to operate consistent with the charter services operated on behalf of sports teams where an air carrier buses its customers from an off-Airport location (*e.g.*, a hotel) to its aircraft on the terminal ramp or at an FBO.

57.     JSX was and remains willing to access and to operate out of any reasonable location at the Airport.  I have told the County and Mr. Rondinella this several times, but every option I have presented has been denied or ignored.

58.     The County approved the leases containing this Access Restriction at the September 15, 2020, Board meeting, despite dozens of JSX customers and employees appearing personally and imploring the Board to provide access to JSX. A recording of the Board's September 15, 2020 meeting can be found here: https://ocgov.granicus.com/player/clip/3785?view_id=8&redirect=true         (last accessed December 10, 2020).  The Board's Agenda Revisions and Supplements from       the       September       15,       2020       meeting       can       be       found       at https://board.ocgov.com/sites/bos.egovoc.com/files/2020-09/rev-sup09152020.pdf (see Attachments A and B) (last accessed December 10, 2020).

59.     Around the same time that the Board was considering and ultimately approved the new Access Restriction, subsequent to my September 11 call with Mr. Rondinella and in anticipation of the September 15 Board meeting, JSX reached out to the Orange County traveling public and asked them to write to the Board if they opposed the Access Restriction that the Board was considering.   The public responded with more than 5,500 emails to the Board in the ensuing 72 hours articulating their staunch support of JSX and opposition to the Access Restriction. The emails told the Board that JSX is a uniquely valuable air carrier and should be

preserved at JWA.  Not a single person wrote in opposition.  Not one.  According to the Orange County Clerk, this was the largest number of emails ever received by the Board from the public on a single issue.  Contrary to his normal practice, Orange County Counsel Leon Page did NOT read a single one of those emails into the record when JSX was discussed.  Among these displeased County residents are many immunocompromised individuals who need to travel for medical treatment; medical professionals engaged in fighting the pandemic; or first responders who enable California to manage emergencies including the pandemic and forest fires, who benefit from JSX's faster and safer type of service.  A collection of a sample of these emails is attached as Exhibit A.

60.    The County offered JSX several assurances that it would be able to operate its unique and highly rated type of service in 2021.  These assurances were provided both before and after the new leases were approved.

61.    The County requested that JSX not pursue legal remedies when the leases' Access Restrictions were approved as it was prepared to offer an "olive branch" that would provide JSX with the ability to continue operating and providing access to its type of services out of JWA consistent with JSX's business model, type of services and federal law.

62.    For example, on September 21, 2020, the County suggested that JSX would be permitted access to operate from the ACI Jet terminal for another year (*e.g.*, for all of 2021).  This would allow JSX to continue to operate as it always had for another year, and to plan for alternative accommodations at JWA during that time.

63.    On September 25, 2020, JWA officials, including David Pfieffer, Nik Gaskins and Richard Steele, met with JSX personnel, including myself, Vice President of Hospitality Sherry Groff, and Vice President of Commercial David Drabinsky, and ACI Jet minority partner Joe Daichendt, to explore and create potential alternatives to accommodate JSX operations.

64.    One proposed alternative was for JSX to operate and access JWA out of

the U.S. Customs and Border Protection ("USCBP") Federal Inspection Service ("FIS") area at JWA when it is not in use by USCBP.  FIS facilities are designed to allow non-SIDA passengers that have not been screened by TSA to arrive at an airport and keep them segregated from the SIDA area.

65.     Contrary to an assertion in a November 19, 2020 letter from Mr. Rondinella (further discussed below), USCBP does not have any requirement that only Part 121 carriers can use FIS facilities.  Part 135 carriers, such as JSX, routinely use major airport jetways when arriving from international destinations.   For example, this commonly occurs at McCarran International Airport in Las Vegas, Nevada, and at Los Angeles International Airport (LAX).

66.     JWA's FIS facility has been vacant since 2018 because there have been no international operations at JWA since 2018.

67.     There are no international flights scheduled at JWA until March 11, 2021.  Beginning on March 11, 2021, Southwest Airlines ("Southwest") will provide limited service between Mexico and JWA, with one flight a day to and from Cabo San Lucas and one flight to and from Puerto Vallarta.   The flights are currently scheduled to arrive at JWA at 3:45 p.m. and 6:15 p.m.

68.     Therefore, JSX could have used, and still can use, the FIS facility at JWA without restriction until March 11, 2021.  This would provide the County ample time to create a non-SIDA corridor to a gate or ramp location at the terminal which the County could designate for access by JSX.   JSX's arriving and departing customers could then access the Airport through a designated gate without impediment to themselves or any other air carrier or passenger.

69.     JWA could also accommodate access to JSX at the FIS facility after March 11, 2021.  JSX can schedule its flights around Southwest's two daily flights, and the FIS facility can be cleared easily before and after Southwest's arrivals.

70.     Following the September 25, 2020 meeting, JWA and County officials communicated to JSX that a firm proposal—the aforementioned "olive branch"—

would be forthcoming, but not until after the election in early November.

71.    Also following the September 25, 2020 meeting, I spoke with Concord, California Airport Director Keith Freitas about Orange County.  Mr. Freitas explained to me that he could not understand how JWA could attempt to kick out JSX, and that it was contrary to federal law, Grant Assurances and other obligations.

72.    In advance of the November 3, 2020 Board meeting, Mr. Rondinella recommended that the Board approve JSX's 2021 allocation request under the Access Plan in full.  Mr. Rondinella also requested that the Board allocate two Remain Overnight aircraft parking spots to JSX.  A true and correct copy of the Agenda Staff Report for the November 3, 2020 Board meeting is attached as Exhibit E.

73.    Acting in the good faith belief that JWA would not precipitously and illegally deny JSX access to service at JWA after having approved its 2021 allocations and promised an olive branch and reasonable accommodations would be forthcoming, JSX complied with the County's request that it not seek legal redress for the County's violation and waited to hear the County's proposed path forward. As a result of trusting JWA, and in light of JWA's refusal to make the promised reasonable accommodations, JSX now finds itself crammed up against a deadline just over two weeks away and sandwiched between two major holidays.

74.    In reliance upon JWA acting in good faith to make the promised reasonable accommodations, JSX has continued to sell tickets to customers for flights departing to or arriving at JWA after January 1, 2021; to schedule new routes that incorporate JWA in the city-pairing after January 1, 2021; enter into agreements to service new cities from JWA after January 1, 2021; and market its services to the people who fly into or out of Orange County.

75.    On November 19, 2020, the County issued two letters to JSX.  True and correct copies of these letters are attached as Exhibits F and G.

76.    In these letters, the County refused to offer any accommodation to JSX (notwithstanding the prior discussions) and terminated JSX's access to JWA for its

type of non-SIDA business model or authority to operate as a commuter air carrier from the FBO as of January 1, 2021.

77. From the September 25, 2020 meeting until now, the County did not even attempt to communicate with JSX to explore any potential modification or implementation to enable one of the five proposed accommodations.

78. To date, despite JSX's numerous requests, Defendants have not provided any basis, justification, or reason for adding the Access Restriction in the leases or for terminating JSX, although such termination was received less than 48 hours after JWA's announcement of competitors Spirit and Allegiant Airlines ("Allegiant") (who fly many of the same routes in large aircraft) welcome to JWA.

79. We did not pursue legal action against the County as we remained optimistic that they would honor their prior representations and provide us an accommodation. However, on December 10, 2020, the agenda for the County's December 15, 2020 meeting was released. This is the final public meeting of the year and the last opportunity for the County to ameliorate its Access Restriction and lack of accommodation for JSX. JSX anticipated being included on the public meeting agenda and that the County would address the constitutional violation. Instead, JSX was not on the agenda and thus it became clear that the only way JSX could protect its rights was through this action. A true and correct copy of the Board's agenda for the December 15, 2020 meeting can be found here: https://board.ocgov.com/meetings-agendas (last accessed December 10, 2020).

80. It is my belief, based on the circumstances and conversations I have had, that the County was motivated to prohibit JSX from operating at JWA to favor the more politically powerful major airlines, although in doing so JWA has denied JSX non-SIDA business model access to JWA and has eliminated JSX's unique and highly rated service to the public.

81. For example, on November 17, 2020, and two days prior to issuing the letters terminating JSX's authority to operate at JWA, the Airport held a ceremony

to celebrate the commencement of operations of Spirit at the Airport.  Mr. Rondinella spoke at the ceremony and officially welcomed Spirit to JWA.  Prior to and during this time, Mr. Rondinella ignored JSX's requests for a variety of feasible reasonable accommodations.

82.     Competitor Spirit has launched service from JWA to both Oakland and Las Vegas, which are both cities currently served by JSX.  If the County's Restriction is allowed to stand, and JSX is not offered a reasonable accommodation, the Airport will have succeeded in eliminating the public's access to the services of one of three competitors on the JWA-Oakland route and one of four competitors on the JWA-Las Vegas route—all to the benefit of the major airlines serving those routes to the detriment of the public by ending the service of JSX, the most highly rated airline providing that service to the public today.

83.     On November 17, 2020, Mr. Rondinella also welcomed competitor Allegiant to JWA as a "new airline partner."  Allegiant will be offering service from JWA to Reno, which is another route that is served exclusively by the more highly rated JSX.

84.     If the Access Restriction is not enjoined, JSX will suffer a substantial loss of business and extreme economic harm.  JWA is one of JSX's largest and highest yielding markets.

85.     At various times since 2018, JSX has flown or is scheduled to fly routes that connect the following cities from its operations at JWA:  Las Vegas, Oakland, Phoenix, Reno, Mammoth Lakes, Napa, Concord, and Palm Springs.  On some routes, such as Oakland and Las Vegas, JSX competes with the services of major airlines.  On the JWA-Reno route, JSX offers the only nonstop service—until Allegiant commences the route after January 1, 2021 when JWA's illegal conduct has driven JSX from the Airport.  The Access Restriction will effectively shut down JSX's ability to provide flights to and from JWA, costing it up to 35% of its revenue as it loses customers not only in Orange County but in every other market it serves

as JSX's route map becomes less relevant to people everywhere.  The impact will be crippling on JSX's business.  Our business is capital intensive and profitability depends on our ability to achieve economies of scale.  The instant loss of a major market that JSX has invested 3 years developing threatens the long-term viability of JSX's services.  The County's Access Restriction is immediately fatal to JSX's JWA services but financial shock and damage to reputation calls into question whether our business can survive in the long run.

86.     In addition to the irreparable harm to JSX customers discussed above, the Access Restriction causes irreparable harm to JSX by putting JSX at a competitive disadvantage to other carriers operating at JWA.  The Access Restriction makes it impossible for JSX to operate any route, service or schedule to and from JWA under its federally approved non-SIDA model of service.  For example, JSX flies from many non-SIDA airports and provides services that otherwise would not be provided.  From these non-SIDA sites, and pursuant to federal law, JSX cannot access the SIDA JWA main terminal as the Access Restriction would require.  As such, the Access Restriction effectively terminates JSX's federally approved non-SIDA service and JSX's access completely at JWA.  JSX's loss of its ability to compete against major air carriers at JWA is total.

87.     Because of the drastic impact on JSX's business, JSX would be forced to eliminate jobs.  Currently, JSX's operation at JWA directly employs more than 50 individuals who live in or near Orange County.  Hundreds of additional jobs are supported indirectly.  If the Access Restriction is enforced, JSX will be forced to lay off all its employees that support its operation at JWA and potentially hundreds elsewhere as our customers opt to drive or choose alternative means of travel.  Our valued employees will suffer irreparable harm.  JSX is a high quality employer, has been named a "Best Place to Work", scores a perfect 100 points on the Human Resources Council Corporate Equality Index, and provides well paid jobs to pilots, flight attendants, maintenance technicians, customer service and other staff.

88.    The Access Restriction will cause incalculable and irreversible damage to JSX's goodwill, relationships, market share, and reputation.  For example, JSX will suffer irreversible and irreparable harm to its reputation by canceling all its flights scheduled based upon JWA's olive branch promises of reasonable accommodations.  JSX has spent a significant amount of time and resources marketing to the traveling public in and around Orange County.  JSX will lose its ability to serve its customers that fly in and out of JWA that it has worked hard to acquire over the years, and will accordingly lose as many as 50% of its customers, shrinking the business to an economically unsustainable size.  Passengers who purchased tickets for future travel will also suffer irreparable harm from JWA's action if JWA's termination becomes effective.

89.    JSX is already suffering many of these irreparable harms as it has already sold tickets for over one thousand flights arriving at or departing from JWA in 2021 based on its DOT approved Part 380 schedule filing listing its flights to and from JWA and assurances from Defendants; has entered into agreements to fly routes that connect other cities to JWA; has entered into agreements with businesses in Napa, California to serve mutual customers together and has spent a significant amount of time and resources marketing to the traveling public who fly to or from JWA. JSX will suffer irreversible and irreparable harm to its reputation by canceling all its flights scheduled based upon JWA's olive branch promises of reasonable accommodations.  Its customers will not trust its word any longer vis a via the large aircraft carriers.

90.    Loss of access to JWA will also discourage JSX customers in other markets from booking with JSX due to reputational harm, loss of network relevance and perceived unreliability of JSX through no fault of its own.

91.    JWA's actions produce additional irreparable harm.  Because of its unique operating model, JSX has the burden of explaining the nature of its services to airports as well as many members of the public are otherwise unaware of it.  In its

five-year history, JSX has successfully invested the time and money to attract a significant base of customers.  Now JWA wants to disenfranchise those customers and remove their right to fly on JSX, and literally hand them over to JSX's legacy major airline competitors.  Not only is JSX harmed in reputation, but pandemic or no pandemic the JSX customer is deprived of her access to the nation's air transportation network, deprived of her access to a crowd-free aviation experience at a consumer-friendly price point.  Indeed, JWA seems to think only those who can afford to purchase or charter a private jet should be able to access the FBOs and crowd-free flying on a safe and secure jet.

92.    The Access Restriction also harms the other airports that JSX connects to and from its operations at JWA, as well as the communities they serve.  Many of the airports that JSX connects to (including Concord, Napa and Thermal) do not have TSA security screening at all.  Therefore, if JSX were forced to operate in JWA's SIDA terminal, it could not fly from those airports and hundreds more like them to JWA and it would be forced to abandon its business model.  In this way, the Access Restriction will eliminate JSX's highly rated and differentiated (from the major airlines) access and services to those airports and routes to the public.

93.    Several other airport directors, counties and businesses have contacted JSX and Mr. Rondinella to voice their opposition to the Access Restriction and support for JSX's continued access, services and operations at JWA.

94.    For example, the Director of Airports for Contra Costa County Airports, Keith Freitas, wrote a letter to Mr. Rondinella on October 14, 2020, opposing the Restriction.  A true and correct copy of this letter is attached as Ex. H.

95.    As emphasized in Mr. Freitas' letter, JSX's operations from JWA have provided a much-needed economic impact on Contra Costa County.  Specifically, "JSX has brought life back to an airport that has not had commercial service in over thirty (30) years."  Further, "JSX's operations have greatly enhanced the economic development and employment opportunity potential for the region."  Mr. Freitas also

notes that "JSX has been operating its unique serve for five (5) years at Buchanan Field Airport and those operations have been very safe, secure, reliable and incident free."

96.    Mr. Freitas' letter to Mr. Rondinella further makes clear that Contra Costa County's Buchanan Field Airport, which JSX connects to and from JWA, does not have a TSA security screening.  Therefore, if JSX is required to move its operation to the JWA terminal, "JSX would not be able to fly between Buchanan Field Airport and John Wayne Airport[.]"  Moreover, "[i]f JSX is forced to operate from the terminal at John Wayne Airport, then you will thwart the expanded economic vitality that JSX will bring to Contra Costa County.  It is vitally important for the County and its residents that the expanded service be accommodated at Buchanan Field Airport and, as such, we respectfully request that you consider the negative impact of requiring JSX to operate from the terminal before making a final decision."

97.    In addition, the Managing Director of the Reno Air Service Corporation, Mr. Carl Ribaudo, also submitted a letter to Mr. Rondinella.  A true and copy of this letter is attached as Exhibit I.  Mr. Ribaudo wrote that: "On behalf of the Reno Air Service Corporation (RASC), whose mission is to increase flight service to the Reno Tahoe International Airport, we would like to voice our support for [JSX] operations at John Wayne Airport."  Mr. Ribaudo explained the benefits to the Reno community from JSX's service: "[N]on-stop flights for residents from Orange County to Reno using [JSX] convenient approach is an integral part of our Southern California efforts to provide service for the business and tourism community…," and noting that that "economic impact of service is significant and vital to our region."

98.    In addition, the President / CEO of the Reno/Tahoe Airport Authority, Daren Griffin, wrote a letter to JSX on December 11, 2020 calling JSX "service is important to the Reno Tahoe community, and offers direct service to key Southern California destinations in a unique product that is rapidly gaining popularity in our

region" and that he hopes "the RNO – SNA service can continue uninterrupted".  A true and correct copy of this letter is attached as Ex. J.

99.    The President and CEO of Vegas Chamber, the largest and broadest-based business organization in Nevada, also submitted a letter to Mr. Rondinella, expressing their "strong support for the JSX operations at John Wayne Airport."  A true and correct copy of Ms. Mary Beth Sewald's letter is attached as Exhibit K.  Ms. Sewald explained that "JSX provides multiple non-stop flights for residents from Orange County to Las Vegas using their convenient and robust services," which supports the Chambers' "ongoing efforts to enhance connection between southern Nevada and Southern California tourism."   Ms. Sewald further explained the significance of JSX's service: "The economic impact of service is vital to our regions and as such, we ask that you support JSX and their continuous efforts to provide outstanding service to the tourism industry."

100.   The director of an airport served by JSX told me that Mr. Rondinella is planning to send him and other airport directors a letter saying that JSX "has no legal way of accessing JWA effective January 1, 2020."  In doing so, Mr. Rondinella is attempting to interfere with our business relationships, our customer relationships, and damage JSX's reputation and operation.

101.   The director of yet another airport served by JSX told me that he could not comprehend how Mr. Rondinella can take this position, regardless of whether JWA has an Access Plan or not.  "It's totally illegal, and Barry is actually making your case for you," he told me.

102.   JSX's operations in and out of JWA are also critical for patients requiring air transportation to access medical care and other essential services.  For instance, JSX has assisted Angel Flight West ("AFW") with arranging free air transportation for people who need to travel long distances to access medical care and other essential services.  In 2020 alone, "JSX has donated more than 80 flights to AFW for patients traveling to or from USC's Keck Medical Center, Mammoth

Hospital, UCLA, and other facilities – 11 agencies in all." The Executive Director of AFW has stated that JSX's "operation at KSNA, just like the dozens of our volunteer pilots based there, is a critical lifeline for those needing care in/out of Orange County." Further, "[s]ince 2016, they've helped us save lives." A true and correct copy of the December 9, 2020 letter from the Executive Director of AFW in support of JSX's continued operations at JWA is attached as Exhibit L. All these patients will be denied access and JSX's services by the Access Restriction and lack of reasonable accommodation.

103. The public will also be deprived of the economic benefits of JSX's operations. JSX estimates that the local economic impact of its flight operations is $25 million annually.

104. In his own way, even JWA's Airport Director Defendant Barry Rondinella has publicly admitted the attractiveness of JSX's type of service from the FBO. In a June 20, 2020 interview, Mr. Rondinella described flying through the main terminal as unpleasant: "You know, as an industry we've pretty much wrung the fun out of flying … you know between parking structures and TSA lines and all of that it's become a chore." By enforcing the Access Restriction, Mr. Rondinella is acting under color of law and in contravention to the ADA and other federal law and policy to make sure that the flying experience remains miserable.

105. JSX has shown that there is a better way, a way to serve smaller markets, a way to avoid crowds without having your own private jet. It is one of the innovations Congress hoped for when they deregulated the industry in 1978. But by denying JSX access, the County and Mr. Rondinella are attempting to squelch this innovation.

1        I declare under penalty of perjury under that the foregoing is true and correct.

2    Executed this 13th day of December, 2020 in Dallas, Texas.

                                       Alex Wilcox

Cooley LLP
Attorneys at Law
San Diego

24

DECLARATION OF ALEX WILCOX IN SUPPORT
OF APPLICATION FOR TEMPORARY
RESTRAINING ORDER