1   BRIDGFORD, GLEASON & ARTINIAN
2   Richard K. Bridgford (CA SBN 119554)
    Richard.Bridgford@Bridgfordlaw.com
3   Michael H. Artinian (CA SBN 203443)
    Mike.Artinian@Bridgfordlaw.com
4   26 Corporate Plaza, Suite 250
    Newport Beach, CA  92660
5   Telephone:  (949) 831-6611
    Facsimile:  (949) 831-6622

6   COOLEY LLP
7   William V. O'Connor (CA SBN 216650)
    woconnor@cooley.com
8   4401 Eastgate Mall
    San Diego, CA  92121-1909
9   Telephone:  (858) 550-6000
    Facsimile:  (858) 550-6420

10  COOLEY LLP
11  J. Parker Erkmann (*Pro hac vice*)
    perkmann@cooley.com
12  1299 Pennsylvania Avenue, NW, Ste 700
    Washington, DC  20004-2400
13  Telephone:  (202) 776-2036
    Facsimile:  (202) 842-7899

14  COOLEY LLP
15  Andrew D. Barr *(Pro hac vice)*
    abarr@cooley.com
16  1144 15th Street, Suite 2300
    Denver, CO  80202-2686
17  Telephone:  (720) 566-4121
    Facsimile:  (720) 566-4099

18  Attorneys for Plaintiffs Delux Public Charter, LLC d/b/a
19  JSX Air and JetSuiteX, Inc.

20              **UNITED STATES DISTRICT COURT**

21      **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

| | |
|---|---|
| 22  DELUX PUBLIC CHARTER, LLC D/B/A JSX AIR and JETSUITEX, INC., | Case No. 8:20-CV-2344-JLS (KESx) |
| 23 | **AMENDED COMPLAINT FOR JURY TRIAL** |
| 24 | |
| 25                    Plaintiffs, v. | Judge: Hon. Josephine L. Staton |
| 26  COUNTY OF ORANGE, CALIFORNIA, a charter county; BARRY RONDINELLA in his official capacity as Airport Director of John Wayne Airport, | Magistrate Judge:  Karen E. Scott |
| 27 | |
| 28                    Defendants. | |

**NATURE OF ACTION**

1.      Since 2018, Plaintiff Delux Public Charter, LLC d/b/a JSX Air ("JSX") (a small, highly rated, on-demand air carrier) has continuously provided innovative, safe, economical, and federally authorized air transportation services to the public at John Wayne Airport ("JWA" or "Airport").  Plaintiff JSX is a federally licensed air carrier that complies with all applicable laws and regulations.  JSX operates 30-seat aircraft and has never had a safety incident or accident.  According to third party customer satisfaction surveys, JSX is currently the highest rated air carrier in the country.

2.      Plaintiff JetSuiteX ("JetSuiteX") is a federally authorized "indirect air carrier" who partners with JSX to market commercial air carrier services.  JetSuiteX complies with all applicable laws and regulations.  JetSuiteX partners with JSX to offer a unique, convenient alternative to the large, well-funded air carriers (colloquially referred to as airlines) by (a) providing access to small airports and underserved cities not regularly serviced by the large airlines, and (b) providing customers with unique and convenient flying services the large airlines cannot offer customers—a Transportation Security Administration ("TSA")-approved and compliant security process that is faster and more convenient than the typical TSA process that is required for airlines.

3.      Defendants, the County of Orange ("County")—a municipal corporation that owns and operates the Airport—as well as the Airport Director Barry Rondinella, have engaged in a systematic effort to prohibit Plaintiffs from operating at the Airport.  Because of Defendants' conduct, Plaintiffs do not have a solution for access to the federally funded, public use Airport.

4.      All air carriers at the Airport are subject to the Airport's "Access Plan." The Access Plan allows air carriers to deplane and enplane passengers or customers at one of two locations:  the main terminal or a fixed base operator (an "FBO").  The

main terminal is the preferred location under the Access Plan (among other reasons, because the County profits heavily from the captive audience for concessions, leases, and other fees associated with using the terminal), but FBOs are available to non-airline air carriers, such as Plaintiffs.

5.      As discussed more fully *infra*, Plaintiffs cannot use the main terminal at the Airport in its current configuration.  There are two reasons for this.

6.      First, Plaintiffs operate a federally approved style of carriage that does not require its customers to pass through the standard TSA checkpoints found at most large airports.  For context, if a passenger is screened by TSA, he or she enters a Security Identification Display Area ("SIDA").  Most gates at airports are in the SIDA area.  If the passenger has not been screened, he or she is in a non-SIDA area of the airport (e.g., "outside of security").  At almost all airports, some boarding occurs in non-SIDA areas, which enables operators, like Plaintiffs, to use the airport even though their customers are not permitted to enter SIDA areas.

7.      This difference matters for JSX's operations and is a hallmark of its business.  JSX's customers value their time and actively seek to avoid arriving hours early for a flight, especially given that most of the flights JSX operates are themselves only an hour or two long.[1]  As an example, JSX requires its customers to check in 15 minutes prior to departure.  Compare that with the Airport's recommendation for airline passengers utilizing the terminal: "[P]lan ahead and arrive at the Airport 1-½-to-2 hours prior to departure time for domestic flights, and 3 hours for international flights.  This will allow time to comfortably park and complete the check-in and security screening process, and will ensure you'll be at your gate in time to catch your flight. In the early morning you may require extra

---

[1] Such "short-haul" air travel is a market that has declined 30% since 2000—even before the impact of the pandemic—as time-sensitive passengers avoid the airport and the accompanying delays and inconvenience to either stay home or drive.  JSX's service fills a void in our air transportation system.

1   time due to the heavy travel volume."[2]

2   8.   The effect of this is that Plaintiffs' customers cannot access the gates
3   at the terminal because they are not screened in the typical way and thus cannot
4   enter the SIDA area of the terminal.  But at many airports, this is not a problem, as
5   those airports are configured to segregate TSA-screened from non-screened
6   passengers such that non-screened passengers can still access non-SIDA boarding,
7   arrival and the baggage claim areas.

8   9.   But not at the Airport.   To be sure, Defendants could easily
9   accommodate Plaintiffs' customers at the main terminal.  Plaintiffs have identified
10  no less than five ways that this could happen quickly, efficiently, and safely.  In each
11  instance, the accommodation would comply with federal law and maintain security
12  protocols.  This is a very common approach and many airports do this as a matter of
13  course:  a section of the terminal is segregated from the TSA-screened gates (*e.g.*,
14  Albuquerque).  But Defendants flatly refuse to open up the terminal to Plaintiffs'
15  customers.  That leaves, under the Access Plan, one option: the FBOs.

16  10.   However, the FBOs are an illusory option.  The Airport has two "full
17  service" FBOs and one "limited service" FBO.  A full service FBO is a privately
18  run operation akin to a mini-terminal that offers a lobby, fuel services, maintenance,
19  catering, and other amenities to crew and customers alike.  A limited service FBO
20  is, as its name implies, limited to only offering some of these options.  At the
21  Airport, the limited service FBO cannot, for example, offer fuel services and has
22  much more limited space than its full service counterparts.

23  11.   At the Airport, one full service FBO, Clay Lacy Aviation, will not
24  service any jet operators until approximately 2023 because it is currently under
25  construction.

26  12.   The only limited service FBO, Martin Aviation—an entity that

27

28  [2] https://www.ocair.com/travelers/services/travel-tips/.

Defendants suggested may be a viable option for Plaintiffs moving forward—confirmed on June 10, 2021, that it does not have the space to accommodate Plaintiffs' operation.[3]  This seems to be, at least in part, based on the County's threats of increasing Martin's rent (in the middle of a long-term lease period) if it partnered with JSX, as well as the message already delivered by the County to its FBOs regarding its opposition to JSX's operations at an FBO.  Regardless, Martin is no longer a viable option for JSX.  This means that, as a practical matter, only one FBO could host Plaintiffs:  ACI Jet.

13.     This Court is well aware that ACI Jet, and its principal Bill Borgsmiller, are on tenuous grounds with the County.  As a result, Mr. Borgsmiller is willing to do or say anything (including submitting several declarations during the temporary restraining order briefing and offering testimony that was found to "lack[] in credibility" by the Court, Dkt. 25 at 5) to try and stay in the County's good graces.  Indeed, the County could at any point ruin his business at the Airport as it controls his long-term leasehold, which, as this Court observed, led Mr. Borgsmiller to provide testimony at the hearing that was inconsistent with his prior statements.  (Dkt. 25 at 4.)

14.     Defendants knew all of this.  Defendants knew that Plaintiffs' options were limited to working out of ACI Jet or the terminal.  Defendants also knew that Plaintiffs' federally authorized operation could not operate out of the terminal without a slight reconfiguration of the terminal, which Defendants knew they would never approve.  Defendants thus started on a specific and intentional crusade to ensure that ACI Jet would not host Plaintiffs.  Without ACI Jet, Plaintiffs would be effectively evicted from the Airport (despite the myriad federal laws that would be broken in the process).

---

[3] One other possible entity, Jay's Aircraft Maintenance, Inc., is also space constricted.

15.    With that background, Defendants' plot to eliminate Plaintiffs continued in mid-2020 when Defendants began negotiating lease terms ACI Jet and Clay Lacy Aviation.  Both FBOs were awarded long-term leases after an RFP process that took years to complete.  The long-term leases started January 1, 2021. Clay Lacy would begin construction for its facility, and when it was able to host operations, ACI Jet would begin construction on its new facility.  By design, the County set up a monopoly for ACI Jet from 2021-2023.

16.    While negotiating lease terms, Defendants specifically asked whether the FBO candidates would partner with Plaintiffs.  Clay Lacy said "no," but ACI Jet said "yes."  However, shortly after submitting their response, ACI Jet submitted an amended response that crossed out the "yes" and instead made clear they would not work with Plaintiffs.  As this Court put it:  "Mr. Borgsmiller believed that ACI Jet would not be awarded the lease by the County if he indicated that he planned to serve JSX in 2021 or beyond. This led Mr. Borgsmiller to change his answer to Question 3 in the lease application." (Dkt. 25 at 4; Exhibit A.)

17.    At the same time, Defendants were soliciting comments on the proposed lease terms from non-parties, such as the City of Newport Beach.  After discussions with the City of Newport Beach, a new term was added into the proposed lease that specifically and intentionally targeted Plaintiffs—and only Plaintiffs—and made it impossible for them to operate out of an FBO.  This is the illegal Lease Restriction that this Court enjoined on January 3, 2021.  (Dkt. 25.)

18.    After this Court enjoined the illegal Lease Restriction, the FAA told Defendants that they had to comply with federal law and accommodate Plaintiffs. Indeed, on January 27, 2021, the FAA informed the County that the illegal Lease Restriction was almost certainly illegal because "this requirement may limit access by forcing the CFR Part 135 operator to incur the cost for a process not required to hold the operating certificate, affect its business model and rate structure, and affect

its operations at other airports. Additionally, passengers who did not clear TSA security at their departing airports would not be able to enter the sterile area upon arrival at SNA." (Exhibit B.)

19.     Defendants then repealed the illegal Lease Restriction. But their desire to eliminate Plaintiffs remained strong and they continued to exercise other forms of unlawful force to try and eliminate Plaintiffs.

20.     For example, around the same time this lawsuit was initiated, Defendant Rondinella sent letters to the FBOs instructing them not to partner with Plaintiffs. (Exhibit C.)  Then, after the illegal Lease Restriction was enjoined, Defendants kept the pressure on in other ways (*e.g.*, threatening increases in rent or otherwise strong arming ACI Jet). Defendants made it clear that ACI Jet—the only FBO that could host Plaintiffs' operation at the Airport—would be punished if it opted to partner with Plaintiffs, especially because on information band belief it appears ACI Jet is already trying to renegotiate its lease with the County (despite having been awarded it less than 12 months ago). Defendants' pressure worked.

21.     As noted, ACI Jet was originally willing to work with Plaintiffs as it had done since 2018. It stated as much to the County in its RFP response during summer 2020. But after receiving feedback from the County, ACI Jet changed its tone, refused to work with Plaintiffs, and understood its marching orders:  it could not partner with Plaintiffs without risking its future at the Airport. (Dkt. 25 at 4; Exhibit A.)

22.     Since that time, ACI Jet has evicted Plaintiffs, tripled the fees they charge to Plaintiffs, brought an unlawful detainer suit against Plaintiffs, and is actively trying to terminate Plaintiffs' right to operate out of their FBO.  These proceedings are pending before Judge Selna and, if ACI Jet prevails, will result in Plaintiffs having nowhere to call home at the Airport. This is the goal and intention of the County and the direct result of the County's illegal tactics to eliminate

Plaintiffs from the Airport.  This discrimination is prompted in part by the County's desire to appease vocal components of the City of Newport Beach.

23.    After repealing the illegal Lease Restriction, Defendants' conduct demonstrates that it remains actively engaged in its crusade against Plaintiffs.  For example, since February, Defendants have sent no less than four violation letters to Plaintiffs.  (Exhibits D, E, F, and G.)  The violations announced in these letters purport to punish Plaintiffs for not complying with allocation or parking requirements that were never issued by the County.

24.    Defendants also remain steadfast in their refusal to even consider any other location at the Airport for JSX to operate.  JSX offered at least a dozen options—many of which are currently being used by other operators at the Airport, such as charter flights for sports teams or international flights conducted by airlines—each of which would comply with federal law.  Exhibit H attached to this Amended Complaint is a map of the Airport with visual depictions setting forth some of the viable areas where Plaintiffs could operate from in a reasonable and non-discriminatory manner.  Defendants have failed to explain why these locations are not available.

25.    But Defendants have rejected or have not even respond to these proposals, much less provide a reason why Plaintiffs' access is being denied.  The true reason is clear:  Defendants are intent on eliminating Plaintiffs from the Airport and are doing everything in their power to ensure that Plaintiffs are removed.

26.    Despite JSX's repeated requests for accommodation and presentation of at least a dozen suitable ways to achieve it, the County has refused to permit JSX to operate anywhere at the Airport other than an FBO.  And then the County threatened each FBO to ensure they would not accommodate JSX, and specifically exerted pressure on Mr. Borgsmiller—as noted by this Court (Dkt. 25)—to ensure that ACI Jet would not continue to partner with Plaintiffs.

27.     Defendants' conduct of limiting JSX's access to the Airport prevents Plaintiffs from offering diverse and underserved routes and services that are fully authorized by federal law.  Defendants' conduct was performed with the specific intent of discriminating against Plaintiffs.

28.     As a result, Plaintiffs have been unable to obtain a solution at an FBO and Plaintiffs have been prohibited from operating out of the terminal.  These are the *only* options provided by Defendants, which effectively means that Plaintiffs have nowhere to turn to ensure reasonable and non-discriminatory access to the Airport absent relief from this Court.

29.     The County's conduct is unconstitutional for at least two reasons: (1) it is preempted by federal law; and (2) it violates Plaintiffs' right to equal protection under the law.   For both reasons, Plaintiffs seek declaratory and permanent injunctive relief to ensure that they will be able to provide air transportation services at the Airport.  Plaintiffs also seek damages, including nominal damages, due to the County's completed and on-going violations of law.

**PARTIES**

**Plaintiffs**

30.     **Plaintiff Delux Public Charter, LLC d/b/a JSX Air ("JSX")** is a Delaware limited liability company with its administrative offices located at 1341 Mockingbird Lane, Suite 600E in Dallas, Texas.  JSX is an FAA-certificated, on-demand air carrier that operates commercial flights pursuant to 14 C.F.R. § 135 and holds a Commuter Air Carrier Authority issued by the DOT.  JSX's operations are safe, legal, quieter than any other commercial operator at JWA, and offer the traveling public a unique alternative to the traditional air carriers.  Indeed, due to JSX's ability to facilitate a fast, terminal-free, and socially distanced boarding and travel experience, customers are able to travel with confidence even during the pandemic.  JSX has an impeccable safety record and is fully compliant with all

1  applicable federal, state, and local laws.

2      31.    **Plaintiff JetSuiteX, Inc. ("JetSuiteX")** is a corporation organized

3  under the laws of the State of Delaware with its principal place of business located

4  at 1341 Mockingbird Lane, Suite 600E in Dallas, Texas.  JetSuiteX is the parent

5  corporation of JSX.  JetSuiteX is an indirect air carrier that sells tickets for JSX

6  flights pursuant to authority granted by the DOT.  JetSuiteX is fully compliant with

7  all applicable federal, state, and local legal obligations.

8  **Defendants**

9      32.    **Defendant County of Orange, California ("County")**, is a municipal

10  corporation located in the Central District of California, with capacity to sue and be

11  sued.  The County is the owner and operator of the Airport.  The Airport, a division

12  of the County, is a commercial and general aviation airport located at 18601 Airport

13  Way, Santa Ana, California, within the Central District of California.  The Airport

14  is the only commercial service airport in the County and the primary provider of

15  general aviation services and facilities in the County.[4]  The County receives federal

16  grant money to operate the Airport and, as a result, is obligated by the Grant

17  Assurances and federal statutes to operate in a reasonable, non-discriminatory, and

18  financially self-sustaining manner.  The County operates and maintains the Airport

19  as a governmental function for the primary purpose of providing air transportation

20  to the public.  The County is managed by five elected officials who make up the

21  Orange County Board of Supervisors ("Board").  The Board, and each of its

22  individual members, are representatives, agents, and employees of the County and

23  the scope of their duties includes, among other things, approving and enforcing lease

24  terms at the Airport.  The County is a person within the meaning of 42 U.S.C. § 1983.

25      33.    **Defendant Barry Rondinella ("Mr. Rondinella"; collectively with**

26  **County, "Defendants")** is named in his official capacity as the Airport Director of

27

28  [4] https://www.ocair.com/aboutjwa/

JWA.  At all times relevant to this complaint, Mr. Rondinella was an agent and employee of the County who was responsible for developing airport policies, administering all activities associated with the operation of a medium hub commercial airport, and had direct responsibility for five airport divisions:  Business Development, Facilities, Finance and Administration, Operations, and Public Affairs.  Mr. Rondinella reports to the County and is responsible for carrying out policies, procedures, and duties regarding the Airport authorized by the Board. Mr. Rondinella is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this Complaint.  Mr. Rondinella's official residence is at JWA, which is located in Orange County, California, within the Central District of California.

## JURISDICTION AND VENUE

34.  This Court has original jurisdiction over the subject matter of this action pursuant to (1) 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under laws of the United States; (2) because this suit seeks redress for the deprivation, under color of state law, for rights secured by the United States Constitution; and (3) this Court's inherent jurisdiction to grant equitable relief for violations of the United States Constitution.

35.  This Court has personal jurisdiction over Defendants because they are domiciled in, reside in, or are a county located in California and because their denial of JSX's rights under the United States Constitution and the laws of the United States occurred within California.  The injuries caused by each Defendant occurred in California.

36.  Venue is proper in the Southern Division of the Central District of California because Defendants reside in the District and because a substantial part of the events or omissions giving rise to the claims occurred in the District.

37.  This Court has authority to enter a declaratory judgment and to provide

preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

38.     This Court also has authority to enter injunctive relief for Defendants' violation of federal law and the United States Constitution through equity jurisdiction authorized by *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny.

## STATEMENT OF FACTS

**JSX Is Federally Authorized And Indisputably Safe**

39.     JSX is an FAA-certificated air carrier that is authorized by federal law to fly customers for compensation or hire under the FAA's operating rules contained in 14 C.F.R. § 135 ("Part 135"). JSX also holds a commuter air carrier authorization issued by the DOT.

40.     JSX has been operating at JWA since June 2018. JSX has never had a safety incident or accident at JWA or elsewhere in its five-year operating history.

41.     JWA is one of JSX's largest markets. At various times since 2018, JSX has flown (or is scheduled to fly) routes that connect the following cities from its operations at JWA:  Las Vegas, Oakland, Phoenix, Reno, Mammoth Lakes, Monterrey, Napa, Concord, Thermal, Dallas, and Palm Springs. On some routes, such as Oakland and Las Vegas, JSX competes with the services of airlines. On other routes, such as Reno, Concord, and seasonal flights to Mammoth and Thermal, JSX offers the only nonstop service.

42.     Currently, JSX's operation at JWA directly employs more than 50 individuals who live in or near the County. Hundreds of additional jobs are supported indirectly. JSX has paid over $13.2 million to operate at JWA, including over $8.8 million in rent, fuel, passenger facility charges, landing, and other fees paid at the Airport. JSX estimates that the local economic impact of its flight operations is $25 million annually.

43.     JSX's operations are fully compliant with federal law, but they are

structured differently than the large scheduled airlines that operate at JWA.  JSX's departure times, departure locations, and arrival locations are specifically negotiated with its sole customer, JetSuiteX.  JetSuiteX is an indirect air carrier that has authority from the DOT under 14 C.F.R. § 380 to sell individual seats to the public on the flights it organizes on JSX.[5]

44.     The most unique aspect of JSX's operations is that its customers do not have to enter the terminal of an airport to board or deplane:  the result is a fast, crowd-free airport experience.

45.     JSX's federally approved certification status and its TSA-approved "Twelve-Five" Security Plan[6] (which is superior to and in many ways exceeds the standard TSA plan utilized in the main terminal) and business model require it to deplane and enplane customers at locations within the Airport that are *not* SIDA.  A SIDA location is differentiated and cordoned off from non-SIDA locations at the Airport—but JSX's non-SIDA security checkpoints are TSA-approved and meet federal regulations.

46.     Customers of large airlines who board from terminal buildings are required to pass through a TSA security checkpoint in order to enter the terminal (which is a SIDA location) at JWA.  The TSA security checkpoints—and the crowds, frustration, and delays associated with them—are ubiquitous for the average airport user.

47.     But JSX is different.  JSX operates pursuant to a federally authorized regulatory protocol that permits its customers to bypass normal TSA security

---

[5] Under this federally authorized arrangement, JetSuiteX sells tickets to the traveling public, JetSuiteX charters an entire JSX flight, and then JSX operates the flight using the time, location, and destination designated by JetSuiteX.

[6] The "Twelve Five" Security Plan refers to a category of TSA-approved security plan applicable to the operation of certain aircraft with a maximum certificated takeoff weight of 12,500 pounds or more.  *See* 49 C.F.R. § 1550.7.

checkpoints; bypass large crowds and long lines; and bypass the typical time spent waiting for an airplane to board and depart.  JSX is both faster and safer.  JSX maintains a rigorous TSA-approved and monitored security plan, but it does not process customers through the main terminal's TSA checkpoints.

48.     Unlike the major scheduled air carriers, JSX operates 30-seat aircraft and offers a type of service that FAA regulations classify as "on-demand" services.  *See* 14 C.F.R. Part 110.2 (defining "on demand" operations).  Under applicable regulations and its TSA-approved security plan, JSX can operate (and has for several years incident free, at every one of its airports) from non-SIDA portions of JWA, such as an FBO (discussed *infra*).  Under federal regulations, JSX does not need to operate from an FBO, but it must operate from a non-SIDA portion of the Airport with access to the airfield.

49.     Put another way, JSX can legally and safely permit its customers to board and deplane *without* the need to pass through a TSA-security checkpoint.  Importantly, JSX cannot legally permit its customers to enter SIDA areas of JWA because non-SIDA and SIDA customers cannot commingle under federal regulations.  As a result, JSX's customers are federally *prohibited* from entering the main terminal at JWA (because Defendants refuse to authorize a non-SIDA area in the terminal).  In other words, the County's conduct (premised on the Access Plan) has forced JSX to find an FBO to work with; otherwise, JSX's ability to operate under its otherwise fully FAA-compliant procedures will be eliminated.

50.     Moreover, even if JSX wanted to introduce a requirement that its customers pass through a SIDA-compliant security checkpoint at JWA in the main terminal, by law it would be unable to do so.  This is true because several of the airports that JSX operates out of for routes that link to JWA, such as the airports in

Concord, Thermal, Mammoth Lakes, and Monterey do not have a TSA-checkpoint.[7] As a result, JSX cannot fly out of Concord to JWA and introduce its customers into the SIDA portion of the airport. Similarly, the JSX flights operating from airports with TSA checkpoints, such as McCarran International Airport in Las Vegas, Nevada, originate from non-SIDA locations that lack TSA facilities. Hence, any effort by the County to eliminate JSX from the Airport—through a lease restriction, strong-arming FBOs, or flatly refusing to authorize a non-SIDA area in the terminal—operates to improperly regulate the preempted field of aviation by eliminating "access" to JWA on those routes, thus effectively eliminating those routes and services, which are beneficial to the public.

51.    To be sure, JSX has adopted and implemented security protocols that *exceed* TSA requirements, but it screens and boards its customers (approximately 30 per flight) much more rapidly than the larger air carriers who process hundreds of customers per flight and are required to operate from the SIDA portions of the terminal (including the TSA checkpoints). JSX thus provides its customers with a much more rapid, socially distanced way to board and travel: no large groups waiting to pass through security; no large groups waiting to board; and no large groups waiting to retrieve baggage. At the height of a global pandemic, this is the worst time to eliminate JSX's services that benefit the public—including immunocompromised customers who are fearful of greater risk and exposure to infection at the main terminal.

52.    Because JSX's non-SIDA (but TSA-approved) security protocol can never be mixed with the SIDA security protocol employed at the main terminal, JSX's customers are not required to pass through TSA-security checkpoints.

---

[7] These airports are not authorized under 14 C.F.R. § 139 and thus they cannot be serviced by airlines. They can, however, handle flights from on-demand carriers like JSX. Therefore, JSX's operations from these airports to John Wayne Airport is essentially in connecting the underserved market in which the airports are located.

Instead, these customers are required, by federal law, to utilize non-SIDA locations at the Airport.

53.     But this is not problematic and, instead, is one of the most attractive aspects of JSX's business model.  Entirely consistent with federal law, JSX's customers can arrive 20 minutes before a flight, pass through JSX's TSA-compliant and approved security procedures at the FBO, and avoid long lines and large crowds.  This is only possible if JSX is able to utilize a non-SIDA location at an airport for boarding and deplaning.  Defendants know this.  However, Defendants have refused to provide a reasonable accommodation to permit Plaintiffs to continue their operations at the Airport through a non-SIDA location, in violation of federal law.

54.     Because of JSX's boarding process and other customer-centric efforts, JSX is the highest rated air carrier in North America, and the attractiveness of its service has only grown during the pandemic.  As stated in a 2020 Forbes article about JSX:

> The JSX Simpli-Fly program is centered around the current needs of the Covid traveler, including:  increased aircraft and lounge sterilization throughout the day, maintaining only 30-[customers] onboard per flight, 2x1 seating configuration with a minimum of 36-inch pitch and no middle seats or overhead bins and an advanced air circulation system that combines a significantly higher percentage of fresh versus recycled air while creating "mass flow balance," which means each section of the cabin has its own air induction and removal stream.[8]

55.     JSX has operated for over five years, enjoys a perfect safety record, the highest customer satisfaction of any air carrier in the United States and was named #1 air carrier in North America by APEX, the Airline Passenger Experience Association.

---

[8] https://www.forbes.com/sites/jqlouise/2020/10/27/how-these-brands-are-making-traveling-during-covid-19-easier/?sh=309912371630

AMENDED COMPLAINT

Cooley LLP
Attorneys at Law
San Diego

56.     By contrast, Spirit (which was welcomed to JWA on November 17, 2020, just two days before the County prohibited JSX from accessing JWA on November 19, 2020), has received some of the lowest ratings.  For example, a 2020 Forbes article on airline ratings during COVID stated:

> At the bottom of the list is Spirit Airlines, which receives the lowest ranking of the 10 major American carriers. The low-cost airline ranks poorly due to additional charges for masks, vague cleaning procedures and no efforts to limit flight capacity or protect frequent flyers.[9]

57.     With more space between seats and a low hassle airport experience (*e.g.*, no security lines, no waiting at the gates, and no showing up hours early to board a flight), thousands of customers have told JSX that it is the *only* carrier they will fly until the pandemic subsides.  To that end, more than 5,500 customers contacted the County to voice their opposition to County's efforts to exterminate Plaintiffs from the Airport.  Among these displeased County residents are many immunocompromised individuals who need to travel for medical treatment; medical professionals engaged in fighting the pandemic; and first responders who enable California to manage emergencies including the pandemic and forest fires.

58.     JSX's customer-preferred, critical transportation services have been designated as "Essential" by DOT, the Department of Homeland Security and Cybersecurity & Infrastructure Security Agency.

59.     Moreover, JSX is the most "neighborly" commercial air carrier at JWA.  Studies have shown that JSX operates the quietest commercial aircraft serving JWA, and JSX has worked with JWA and the FAA to implement flight procedures that minimize the negative impacts of noise on the neighboring communities.

---

[9]https://www.forbes.com/sites/laurabegleybloom/2020/07/27/covid-report-best-worst-airlines-coronavirus/?sh=6810a24913af

AMENDED COMPLAINT

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

60.    A 2019 noise study at JWA empirically demonstrated that a single Boeing 737-800—an aircraft commonly used by large airlines—produces the same amount of noise as *thirty-eight* JSX overflights.  The community's concern about aircraft noise is real, and JSX has taken affirmative steps to address the issue.

61.    Simply put, JSX provides a level of safety, convenience, and socially distanced flying experience that is otherwise only available to individuals who can afford to travel in a private jet.  JSX's services are safe, federally authorized, and especially well-suited for individuals who travel during the pandemic.

**JSX Has Safely Operated At JWA Since 2018**

62.    JWA is a "public use" Airport that is funded, in part, by grants obtained under one or more federal programs, including the Airport Improvement Program. The receipt of federal grant money obligates the County to comply with statutorily enumerated obligations, known as "Grant Assurances."

63.    If an airport is obligated to comply with the Grant Assurances, the FAA has made clear that "Federally obligated airport sponsors are required to operate airports for the use and benefit of aeronautical users and to make those airports available to *all types, kinds, and classes* of aeronautical activities on fair and reasonable terms, and *without unjust discrimination*." (emphasis added).[10]  In other words, JWA has a duty to make "reasonable accommodations" to JSX.

64.    In order to comply with its obligation to provide Plaintiffs with "reasonable accommodations," Defendants must provide Plaintiffs access to the Airport on reasonable and non-discriminatory terms.  At bottom, Defendants must ensure that Plaintiffs have reasonable and non-discriminatory access to the *public use* Airport in a way that is consistent with Plaintiffs' federally authorized business plan.

---

[10] https://www.faa.gov/airports/airport_compliance/media/airportSponsor AndUserRightsBrochure.pdf

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

AMENDED COMPLAINT

65.    Pertinent here, the Grant Assurances, as set forth in federal statute, require the County to provide access to all aviation users in a reasonable and non-discriminatory manner.  At minimum, this means that the County cannot arbitrarily seek to exclude an airport user (*e.g.*, an air carrier) from accessing the Airport.[11]

66.    Federal law also prohibits the Airport from creating rules or policies that have the effect of restricting an airport user's access to the Airport.  Defendants' refusal to make any reasonable accommodation for Plaintiffs' operations—and its policy of forcing JSX to find an FBO to work with or be eliminated from the Airport—is a contrived and disingenuous rule or policy that restricts Plaintiffs' access to JWA in violation of federal law.

67.    In April 2018, JWA issued JSX a license to operate from a non-SIDA location—namely, an FBO located at the Airport.  An FBO is an aeronautical service provider located at an airport who, among other things, offers fueling, maintenance, and other ground-based services to aircraft operators.  FBOs typically lease premises from the airport sponsor and are obligated to comply with the Grant Assurances, including the requirement that they offer services in a fair, reasonable, and non-discriminatory manner.  An FBO's lease typically must be approved by the airport sponsor, and the airport sponsor has the ability to require an FBO to include certain terms in its lease.

68.    Under the license, JSX began operating from ACI Jet.  ACI Jet is a large FBO at JWA.  Under this license agreement, JSX would rent space and purchase fuel from ACI Jet.  In return, ACI Jet would provide a location for JSX's customers to board and deplane JSX flights.

69.    The lease that was in effect between ACI Jet and the County before the

_____

[11] JSX has the option to pursue an administrative remedy for violation of the Grant Assurances through a "Part 16" complaint process filed with the FAA. *See* 14 C.F.R. § 16.1 *et seq*.  However, the FAA does not have jurisdiction to resolve the claims raised in this Complaint and thus parallel proceedings would be required.

County passed the illegal Lease Restriction did not contain any terms prohibiting JSX's operations from ACI Jet's FBO facility.

70.     Prior to this lawsuit, ACI Jet publicly confirmed its support for JSX's continued operations at JWA during the Board's meeting held on September 15, 2020.  The *only* reason that ACI Jet has changed its willingness to work with Plaintiffs is because of the County's conduct.  Indeed, due to the Restriction imposed by the County and the County's subsequent strong-arm tactics (discussed *infra*), ACI Jet terminated JSX's ability to operate out of its FBO facility at JWA as of January 1, 2021.

71.     ACI Jet is still actively trying to kick Plaintiffs out of their leasehold and, in fact, ACI Jet has brought an unlawful detainer suit against JSX that is currently pending before Judge Selna (*see* Case No. 8:21-cv-00200-JVS-DFM).

72.     As of the date of this Complaint, JSX still operates from ACI Jet's FBO facility, but it does not have a long-term solution.  Plaintiffs are subject to being ejected from ACI Jet's location at any point.  If that occurs, Plaintiffs have nowhere to operate from at the Airport and, thus, will be unable to continue operations at the Airport.

73.     This illegal result can easily be avoided by Defendants.  There are numerous places at the Airport—both in the terminal and elsewhere—where Plaintiffs could operate in a safe, efficient, and lawful manner.  The only reason this is not occurring is because Defendants refuse to authorize such operations.

**Defendants' Conduct Specifically and Intentionally Targets JSX**

74.     Since the outset of its operations at JWA, JSX has been utilizing FBOs—such as ACI Jet—or its own leaseholds for deplaning and enplaning its customers.  But this is not required:  Plaintiffs can operate from anywhere at the Airport other than the SIDA areas of the main terminal.

75.     In the summer of 2020, the County authorized Mr. Rondinella to begin

negotiating new FBO leases, including with ACI Jet and another FBO named Clay Lacy Aviation, Inc.

76.     If the FBO could not secure a new lease with the Airport, it would be forced to stop operations at JWA.

77.     Mr. Rondinella instructed bidders for the FBO leases, including ACI Jet, that they must agree to lease terms that were intentionally drafted to restrict JSX's access to JWA.

78.     The County and Mr. Rondinella's intent and purpose was to ban JSX from operating routes or providing services out of JWA.  This same sentiment was conveyed directly to JSX.  On September 11, 2020 (four days before the new leases were approved), Mr. Rondinella spoke with JSX's Chief Executive Officer Alex Wilcox.  During this conversation, Mr. Rondinella advised Mr. Wilcox that the Restriction was both required and *intended to prohibit JSX from operating at JWA*.

79.     To that end, if the FBO would not agree to prohibit JSX from using its facilities, their bid for a renewed lease would not be considered.  During summer 2020, Mr. Rondinella spoke with the majority owner of ACI Jet regarding ACI Jet's lease renewal.  On information and belief, Mr. Rondinella told ACI Jet's majority owner, Bill Borgesmiller, that ACI Jet would not be awarded a renewed lease unless it stopped JSX from operating at ACI Jet.

80.     Prior to formally agreeing to Defendants' proposed Restrictions, ACI Jet attempted to negotiate terms that would allow JSX to continue to operate routes and provide services from JWA, but Defendants were insistent that JSX be denied access to JWA.  Defendants have failed to provide JSX a reasonable accommodation to permit its continued operations at JWA, in violation of federal law.  Moreover, Defendants would not permit ACI Jet to offer JSX a transition period.

81.     ACI Jet ultimately agreed, at the County's behest, to restrict JSX's

access to JWA in order that its bid proposal would be considered by the County.

82. Accordingly, at its September 15, 2020, meeting, the County approved new leases between the County and two FBOs:  ACI Jet and Clay Lacy Aviation, Inc. (the "Leases").  As a result, the Leases contained a Restriction that prohibits JSX's operations from the FBOs as of January 1, 2021.

83. The Leases—which only applied to the FBOs from which JSX currently operates—contained the Restriction that prohibited the FBOs from facilitating customer pick-up or drop-off from "Regularly Scheduled Commercial Operators" as defined in the Access Plan[12]:

> **LESSEE shall not permit the operation of a Regularly Scheduled Commercial User as defined in section 2.40 of John Wayne Airport's Phase 2 Commercial Airline Access Plan and Regulation, as may be amended from time to time**.[13]

84. To be sure, the County did not expressly name JSX in the resolution it passed that introduced new, mandatory language in the FBO Leases.  But it intentionally drafted the Restriction for the sole and intentional purpose of making it *impossible* for JSX—and only JSX—to operate at JWA.  The County's Restriction barred JSX from accessing JWA because of its FAA-authorized operations in and out of other non-SIDA terminals—the crux of JSX's operations and business model that enables JSX to compete with traditional airlines.

85. Mr. Rondinella acknowledged that the Restriction intentionally singled out JSX and was required for the sole purpose of eliminating JSX's ability to operate at the Airport.

_____

[12] The Access Plan governs operations at JWA and is a byproduct of the 1985 Settlement Agreement.

[13] Orange County Board of Supervisors, Agenda Revisions and Supplementals (Sep. 15, 2020), Attachment A at 24; Attachment B at 24 (https://board.ocgov.com/sites/bos.egovoc.com/files/2020-09/rev-sup09152020.pdf.

86.     The Access Plan classifies JSX as a "Regularly Scheduled Commercial User."[14]   This is the same category that applies to the large, regularly scheduled carriers, such as Southwest or Delta.  However, because the scheduled carriers are federally required to operate from the SIDA portions of the terminal—a byproduct of the FAA certification status that the major carriers have, set forth in 14 C.F.R. § 121 ("Part 121")—the Restriction applies uniquely to JSX.

87.     The regulatory distinction between the large airlines and JSX is key to understanding the subtle but intentional discrimination inherent in the Restriction, which was intended to prevent Plaintiffs from accessing JWA.  The major carriers who operate under Part 121 *never* operated out of the FBOs, have *always* operated out of the terminal, and are *federally prohibited* from utilizing the FBOs.

88.     Therefore, by drafting the Leases (which apply only to the FBOs) in this manner, the County and Mr. Rondinella intentionally targeted the only "Regularly Scheduled Commercial User" that had operated out of the FBOs— JSX—from continuing to operate out of the FBOs.  In so doing, Defendants knew they were making it *impossible* for JSX to continue operating out of JWA.  The Restriction was intentionally added to the Leases to eliminate JSX—a small and innovative air carrier with a popular model—to eliminate competition for the large

---

[14] The term "Regularly Scheduled Commercial User" defined and used in the Access Plan does not correspond to any term or classification used in the Federal Aviation Regulation.  Instead, under JWA's Access Plan § 2.40, a "Regularly Scheduled Commercial User" means "any person conducting aircraft operations at JWA for the purpose of carrying passengers, freight, or cargo where such operations: (i) are operated in support of, advertised, or otherwise made available to members of the public by any means for commercial air transportation purposes, and members of the public may travel or ship Commercial Cargo on the flights; (ii) the flights are scheduled to occur, or are represented as occurring (or available) at specified times and days; and (iii) the person conducts, or proposes to operate, departures at JWA at a frequency greater than two (2) times per week during any consecutive three (3) week period."

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

AMENDED COMPLAINT

airlines at JWA.  And at the same time, JWA welcomed Spirit and Allegiant that fail to provide the public with the same unique services JSX provides.

89.   The Restriction does not prohibit the operations of any other on-demand air carrier.  Indeed, if a non-JSX carrier operating under the same federal authority and utilizing the same aircraft as JSX arrived at JWA, it would have been permitted to pick-up and drop-off its customers at the FBOs.  JSX was the *only* operator prohibited from accessing the FBOs at JWA as a result of the Restriction.

90.   On December 14, 2020, Plaintiffs brought suit against Defendants, and sought an injunction prohibiting Defendants from enforcing the illegal Lease Restriction.

91.   On January 3, 2021, this Court enjoined Defendants from enforcing the illegal Lease Restriction.  This injunction remains in place as of the date of this filing.

92.   On January 14, 2021, the County Board voluntarily withdrew the illegal Lease Restriction.

93.   Defendants retain the authority to enact the same illegal Lease Restriction or a substantially similar law absent a permanent injunction from this Court.  Defendants' conduct over the past six months—including the issuance of four "default letters" and its continual refusal to work with Plaintiffs to find an accommodation—support the notion that Defendants have every intention of eliminating Plaintiffs from the Airport.  (Exhibits D, E, F, and G.)

94.   Even after the illegal Lease Restriction was enjoined, Defendants have refused to find a reasonable accommodation for Plaintiffs at the Airport.  Instead, Defendants have threatened the FBOs to ensure they would not work with Plaintiffs and refused to consider any other accommodation at the Airport.  Perhaps most notably, Defendants have flatly *rejected* Plaintiffs' numerous requests for access at County-owned, non-SIDA areas of the Airport, including operating from the U.S.

Customs and Border Protection ("USCBP") Federal Inspection Service ("FIS") area in the JWA when it is not in use by USCBP; creating a non-SIDA corridor to a gate or ramp location at the terminal which the County could designate for access by JSX; operating in the same manner as sports team charters operate at the Airport; remaining at the ACI Jet FBO lobby location; escorting passengers to a gate for loading and continuing to operate out of an FBO; or operating from non-SIDA buildings with access to the airfield.

95.     As demonstrated, Defendants have foreclosed all other potential accommodations at the Airport.

96.     After giving JSX assurance that an "olive branch" would be extended following the November 2020 election, the County rejected all of JSX's proposals in a letter dated November 19, 2020.  (Exhibit I.)  The County's illegal Lease Restriction and refusal to make any reasonable accommodation have had the impact of restricting JSX's access to JWA and prohibiting JSX's routes and service from JWA.  As noted, JSX cannot simply begin utilizing the terminal (which is a SIDA location) because, among other reasons, it flies routes that connect JWA to airports that lack TSA-staffed facilities, such as Buchanan Field in Concord, California. Flights from Concord (as an example) cannot deplane at JWA's SIDA-compliant terminal.  Therefore, all routes and services from Concord have been eliminated by the Restriction.  This issue could be avoided if Defendants would allow Plaintiffs to use a non-SIDA area of the terminal, but that type of accommodation has been rejected without explanation.

97.     To date, Defendants have not provided any basis, justification, or reason for refusing to provide Plaintiffs with access to the Airport.

98.     Despite there being no incidents, accidents, or other safety issues for the two-plus years that JSX operated out of ACI Jet, or the five years JSX has operated nation-wide, the County banned JSX's operations.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

AMENDED COMPLAINT

**JWA Refuses To Provide Reasonable Accommodations To JSX**

99.    Defendants have completely restricted JSX's access to the Airport. Furthermore, despite JSX's good faith and best efforts, JWA has denied all requests for accommodation.  Far from providing a "reasonable accommodation" to JSX—as JWA is required to do under federal law and its Grant Assurances—the Airport has failed to provide any accommodation at all.

100.   Seeking to find a reasonable accommodation that would be acceptable to the County, JSX proposed several viable alternatives to the County and Mr. Rondinella for JSX to operate at the Airport.  JSX has written and told this to the County and Mr. Rondinella several times, but every potential accommodation presented by JSX was denied or ignored.

101.   During the September 11 conversation between JSX's Mr. Wilcox and Mr. Rondinella, Mr. Wilcox advised Mr. Rondinella that the Restriction (that had been proposed but not yet approved) would deny JSX access to the ACI Jet facility and asked that JSX be accommodated at another location at the Airport.

102.   To try and find a way to accommodate its services at JWA, Mr. Wilcox renewed a request that JSX has previously made that JWA convert an under-utilized portion of the terminal or terminal ramp and parking area into a non-SIDA area to accommodate JSX's operation.  This request was summarily denied.

103.   JSX also offered, again, to operate out of a number of unused buildings at JWA, convert space to be compliant with its non-SIDA operations, or bus its customers from the FBO to a different loading area for customer pick-up and drop-off.  These reasonable accommodations were also denied.

104.   In addition, JSX proposed to operate consistent with the charter services operated on behalf of sports teams where an air carrier buses its customers from an off-Airport location (*e.g.*, a hotel) to its aircraft on the terminal ramp or at an FBO.  This reasonable accommodation was also formally denied in a letter from

the County dated November 19, 2020.  (Exhibit I.)

105.   JSX was (and remains) willing and able to do anything that would permit it to retain access to the Airport.  In a letter dated January 6, 2021—shortly after this Court enjoined the illegal Lease Restriction—JSX made a series of proposals for alternative sites on the Airport that could accommodate JSX's operation.    (Exhibit   J.)     Defendants   ignored   or   rejected   these   proposed accommodations.

106.   Indeed, Mr. Rondinella and the Airport have repeatedly refused to make any accommodation that would allow JSX to continue to operate at JWA consistent with its TSA-approved security plan and FAA-approved operating authority.

107.   In fact, in conversations with County Counsel, County Counsel has affirmatively stated that any option that involved County-owned land was a "rabbit hole" that will not be approved.

108.   The County's and Mr. Rondinella's refusal was intended to and has denied JSX access to the Airport.  In doing so, the Airport has failed to fulfill the legal obligations it undertakes as a public use airport that receives federal funds, including a commitment "to make [the] airport[] available as an airport for public use on reasonable terms and without unjust discrimination to *all types, kinds and classes* of aeronautical activities, *including commercial aeronautical activities offering services to the public at the airport*."

109.   On November 19, 2020, the County issued two letters to JSX.  In the letters, the County refused to offer any accommodation (notwithstanding the prior discussions) and terminated JSX's authority to operate as a commuter air carrier from the FBO as of January 1, 2021.  (Exhibits I and K.)

110.   To be sure, the termination letter purports to grant JSX the ability to operate out of the SIDA terminal for 2021.  But the County knows that this is

federally prohibited (because the County refuses to authorize a non-SIDA area in the terminal) and thus it intentionally proposed a false option to JSX by forcing its customers through the SIDA main terminal.

111.   Again, JSX is unable to utilize SIDA locations (such as the main terminal) to deplane (as an example) because none of its customers have passed through TSA-checkpoints and, in some cases, are coming from airports that do not have SIDA locations at all, such as Concord, California.

112.   The County's "option" for 2021 set forth in the letter is no option at all.

113.   The County's conduct has had the effect of restricting JSX's access to the Airport and ending JSX's services and routes at JWA due to an inability to find a long-term solution for a place to deplane and enplane its customers.

**JWA Acts In Bad Faith**

114.   Despite the County's and Mr. Rondinella's intention to ban JSX from the Airport, JSX was offered several assurances that it would be able to operate in 2021, *even after the Leases were approved*.

115.   Around the same time that the County was considering and ultimately approved the new Restriction, JSX reached out to the Orange County traveling public and asked them to write to the Board if they opposed the Restriction that the Board was considering.  The public responded with more than 5,500 emails to the Board in the ensuing 48 hours.  These emails came from County residents and national travelers who opposed the Restriction that banned JSX from operating routes and services out of JWA.

116.   Perhaps in reaction to the public outcry, or perhaps recognizing that the Restriction is invalid under federal law and its own Access Plan, the County requested that JSX *not* pursue legal remedies *and wait for resolution until after the election* as it was prepared to offer an "olive branch" to provide JSX with the ability

1 to continue operating out of JWA consistent with JSX's business model and federal

2 law.

3      117.   Acting in good faith, JSX complied with the County's request that it

4 not seek legal redress for this violation and waited to hear the County's proposed

5 path forward.  JSX was optimistic that the County would remedy its constitutional

6 violation and provide a reasonable accommodation as it is required to do under

7 federal law prior to January 1, 2021.

8      118.   Based on these assurances from the County, and in reliance upon them,

9 and the availability of numerous options for JWA to accommodate JSX, JSX

10 continued and continues to sell tickets to customers for flights departing to or

11 arriving at JWA after January 1, 2021; schedule new routes that incorporate JWA in

12 the city-pairing after January 1, 2021; enter into agreements to service new cities

13 from JWA after January 1, 2021; and market its services to the people who fly into

14 or out of Orange County.

15      119.   For example, on September 21, 2020, the County suggested that JSX

16 would be permitted to operate from the ACI Jet terminal for another year (e.g., for

17 all of 2021).  This would allow JSX to continue to operate as it always has for

18 another year, and to plan for alternative accommodations at JWA during that time.

19      120.   On September 25, 2020, JWA officials met with JSX to discuss

20 possible customer and related operational alternatives proposed by JSX, including

21 the following:

22         A.   Operate out of the U.S. Customs and Border Protection
23              ("USCBP") Federal Inspection Service ("FIS") area when
it is not in use by USCBP;

24         B.   Operate from a gate at the main terminal that is
25              underutilized and construct a corridor in order to provide
26              a non-SIDA area for customers to enter and exit the
Airport for boarding;

27         C.   Operate in a manner consistent with sport team charter
28              operations at the Airport and are permitted to use non-
SIDA areas of the Airport for boarding and deplaning;

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

D.     Remain at the current FBO lobby location at ACI Jet and escort customers to the underutilized gate for loading; or

E.     Continue to operate out of ACI Jet in a manner consistent with current JSX operations.

F.     Operate from a facility JSX would construct on the empty lot immediately South of and adjacent to the Terminal.

121.   Following this meeting, JWA and County officials communicated to JSX that a firm proposal—the aforementioned "olive branch"—would be forthcoming, *but not until after the election in early November*.

122.   Despite these assurances, the County did not offer any accommodation to JSX and appears to have been acting in bad faith. Instead, the County summarily denied any of the accommodations that had been proposed and discussed.

123.   The promised "olive branch" was not the only reason that JSX believed, in good faith, that the County would ameliorate its constitutional violation and afford JSX an accommodation.

124.   Due to the Access Plan, JWA has annual capacity limitations on the number of customers that can utilize the Airport.[15] The Settlement Agreement has been modified and the customer capacity limits have increased several times since 1985. *See County of Orange v. Air California, Inc.*, No. CV 85-1542 (Dec. 13, 1985), as amended.

125.   To comply with the Settlement Agreement but also maximize the number of customers who can use the Airport, the County has instituted a process in which air carriers may request a certain allocation of capacity for the upcoming year. Since 2018, JSX has been afforded an annual capacity with the County's full knowledge that its operations are out of ACI Jet's FBO facility.

126.   In parallel with the Lease negotiations, the County engaged in its annual process for allocating capacity under the Access Plan. On August 19, 2020,

---

[15] Some operations do not require an allocation, such as general aviation flights.

AMENDED COMPLAINT

Cooley LLP
Attorneys at Law
San Diego

in a letter from Mr. Rondinella, JWA invited JSX and other commuter air carriers to request customer allocations for 2021.

127.   On September 11, 2020 (four days before the Leases were approved), JSX submitted its timely request for an allocation of 95,070 customers for 2021. This is the same number of customers that JSX had requested, and JWA had approved, for 2020.

128.   Just two weeks before Mr. Rondinella announced commencement of services by Spirit and Allegiant, Mr. Rondinella recommended that the County approve JSX's complete 2021 allocation request at the November 3, 2020, Board meeting.  This suggested that the Airport was expecting JSX to continue operating at JWA, which could only occur if an accommodation was made that did not require JSX to operate out of a SIDA portion of the terminal.

129.   For both reasons—the express "olive branch" statement by the County as well as the implicit recognition that JSX would need customer allocation for 2021 only if it was allowed to operate at JWA—JSX took the County at its word and tried to find a non-litigious solution.

130.   But the County and Mr. Rondinella apparently had no intention of finding such a solution.  Instead, on November 17, 2020, JWA welcomed large airlines Spirit and Allegiant in a well-publicized announcement; and 48 hours later, on November 19, 2020, JWA terminated JSX's services from the FBO run by ACI Jet.  The bad faith with which they operated has now forced JSX to seek emergency relief due to the Restriction becoming effective as of January 1, 2021.

**JSX Needs Declaratory And Injunctive Relief To Avoid Irreparable Harm**

131.   Defendants have targeted and are targeting JSX's operations for elimination with the intention of excluding JSX from JWA.

132.   County officials have admitted that the intent of the Restriction was to eliminate JSX.

133.   On information and belief, the County was motivated to prohibit JSX from operating at JWA to favor the more politically powerful large airlines.

134.   For example, on November 17, 2020, and two days prior to issuing the letters terminating JSX's authority to operate at JWA, Spirit announced that it would begin service from JWA to both Oakland and Las Vegas, which are both cities currently served by JSX.   The Airport held a ceremony to celebrate the commencement of Spirit's operations at the Airport:

**SPIRIT JETS OFF FROM ORANGE COUNTY TO OAKLAND AND LAS VEGAS[16]**



**Spirit began Orange County to Oakland and Las Vegas on 17 and 18 November respectively. Phoenix is coming in January.**

135.   On the same day, the Airport also announced that it would be welcoming Allegiant to begin operating out of JWA—including flights to Reno, another route which JSX services.  If the County's illegal action is allowed to stand, the Airport will have succeeded in eliminating one of three competitors on the JWA-Oakland route and one of four competitors on the JWA-Las Vegas route—all to the

[16] https://www.anna.aero/2020/11/20/spirit-jets-off-from-orange-county-to-oakland-and-las-vegas/

1  benefit of the large airlines serving those routes.  This is just an example of the

2  Airport's discriminatory actions taken to favor Part 121 airlines at the expense of

3  JSX.

4      136.   Moreover, Plaintiffs have learned that the City of Newport Beach was

5  actively involved in the County's decision to enact the illegal Lease Restriction.

6  Discovery showed that the City of Newport Beach was reviewing draft lease terms

7  and suggesting changes to the terms, despite the City of Newport Beach having

8  nothing to do with the Lease:  it is neither the lessor nor lessee.

9      137.   The County was apparently willing to ignore its federal obligations to

10  appease part of its constituent base.  Indeed, the County intentionally targeted

11  Plaintiffs in a naked effort to score political favor with the City of Newport Beach.

12      138.   As a result of Defendants' unlawful conduct, and in the absence of

13  permanent injunctive relief, JSX will suffer an irreparable blow to its business

14  model, substantial loss of business, will be put at a significant competitive

15  disadvantage, will suffer harm to its business reputation and damage to its goodwill,

16  its JWA-based employees will be harmed, and its constitutional rights will be

17  violated.

18      139.   JSX is already suffering many of these irreparable harms as it has been

19  forced to pay higher rates, face uncertainty regarding future operations, bring this

20  litigation, and suffer from negative public relations due to the County's conduct.

21      140.   JSX is not the only party negatively affected by the County's illegal

22  conduct in refusing to provide a reasonable and non-discriminatory option for

23  Plaintiffs.  A significant segment of the traveling public has spoken loudly and

24  clearly that it prefers to travel on JSX as compared to alternative, more crowded

25  modes of transportation.  More than 5,500 travelers affirmatively contacted the

26  Board as a result of the illegal Restriction and dozens appeared at the Board's

27  meeting on September 15, 2020, expressing that they prefer to fly on JSX.

28

Defendants' conduct is harming the County's residents and the public.

**Plaintiffs Remain Without A Solution at the Airport**

141.   Since this Court enjoined the illegal Lease Restriction on January 3, 2021, Defendants have continued to try and eliminate Plaintiffs.

142.   Defendants suggested in proceedings with this Court that Martin Aviation may be a viable location for Plaintiffs.  Defendants then placed several obstacles in the way of Plaintiffs and Martin which took months to navigate.

143.   On June 10, 2021, Martin told Plaintiffs that they were unable to support Plaintiffs' operations.

144.   As already mentioned, the other FBOs at the Airport—ACI Jet and Clay Lacy—have also stated they cannot support Plaintiffs on a going-forward basis.

145.   Plaintiffs thus have only one option to access the Airport under the Access Plan:  the terminal.  But Defendants have refused to accommodate Plaintiffs in the terminal by refusing to allow a non-SIDA area.

146.   As a result, Plaintiffs have no ability to access the Airport—a *public use* airport—on a going-forward basis.

147.   In the meantime, Defendants have sent Plaintiffs four violation letters on February 17, April 6, April 23 and May 20, 2021, that are further evidence of Defendants' larger scheme to eliminate and harass Plaintiffs.  The letters nominally charge Plaintiffs with underutilizing passenger allocations and remain overnight ("RON") aircraft parking allocations in violation of the Access Plan.  (Exhibits D, E, F, and G.)  They charge JSX with failing to operate a minimum percentage of its passenger and RON allocations under the Access Plan—despite the fact that the County *never* officially awarded JSX an allocation for 2021.  The County fails to explain how JSX can underutilize an allocation it never received.  The problem is that Plaintiffs have been asking for their license to operate from the County since

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO
AMENDED COMPLAINT

November 2020 and the County has refused to grant it.

148.   These violation letters underscore the County's intent:   to do everything in its power to discriminate against Plaintiffs and try to force them out of the Airport.

## LEGAL BACKGROUND

149.   Congress has preempted the field of aviation and air carrier regulation. This means that, *inter alia*, counties are not permitted to self-regulate the air transportation industry.  Any effort to do so is invalid under the Supremacy Clause of the United States Constitution.

150.   Congress determined that preemption was necessary in order to, among other things:  encourage entry into the air transportation market by new carriers; strengthen small air carriers to ensure a more effective and competitive airline industry; ensure the availability of a variety of adequate, economic, efficient, and low-priced services without unreasonable discrimination; and to prevent unfair, deceptive, predatory, or anticompetitive practices in air transportation. *See* 49 U.S.C. § 40101.

151.   The DOT and FAA are responsible for implementing, enforcing, and overseeing Congress' duly enacted aviation laws.  The FAA regulates aviation safety and has done so by implementing federal regulations pertaining to every aspect of airport and aircraft operations.  The DOT regulates economic aspects of the aviation industry.  Together, the DOT and FAA have full authority to regulate the aviation industry.

152.   Congress has expressly preempted state and local governments from enacting or enforcing "a law, regulation, or other provision having the force and effect of law related to price, route, or service of an air carrier . . ."  49 U.S.C. § 41713(b)(1).

153.   In so doing, Congress expressly wanted to avoid a patchwork of state

and local regulations from unduly burdening interstate commerce.  As a result, nearly all state and local laws, regulations, or other provisions having the force and effect of law that relate to the aviation industry are preempted and invalid.

154.   Congress allows for an extremely narrow exception to the otherwise wholesale preemption for local governments "carrying out [their] proprietary powers and rights" as airport sponsors.  *Id.* § 41713(b)(3).  If a local government seeks to regulate within this exception, its regulations must (i) conform with federal law and (ii) be otherwise reasonable, non-arbitrary, and non-discriminatory.  *Id*.

155.   Local governments are expressly prohibited from unilaterally imposing regulations in this area absent FAA approval.  In determining whether a local regulation restricting access to a public airport meets the narrow exception, the FAA has stated that such regulations must balance both local and federal interests.  The determination whether local regulations meet these requirements is left to the sole province of the FAA.

156.   Local restrictions or access plans that violate federal law or federal policy are *per se* unreasonable and thus do not fit within the narrow "proprietary right" exception.

**Airport Noise and Capacity Act ("ANCA") Preemption**

157.   Congress' most authoritative expression of intent regarding the extent of federal preemption in the area of access at public airports is the Airport Noise and Capacity Act ("ANCA"), 49 U.S.C. § 47521, *et seq*.

158.   ANCA was adopted after Congress determined that previous federal statutes and regulations were insufficient to ensure a uniform federal aviation policy regarding noise and airport access restrictions.

159.   ANCA, and the FAA's regulatory scheme generally, classify aircraft into four "Stages" based on noise levels.  Stage 1 aircraft emit the most noise, and Stage 4 aircraft emit the least, with Stage 2 and Stage 3 aircraft in between.  JSX

operates Stage 3 aircraft.

160.   Through ANCA, Congress explicitly sought to address the "uncoordinated and inconsistent restrictions on aviation that could impede the national air transportation system[.]" 49 U.S.C. § 47521(2).   Because Congress recognized that local airport sponsors may seek to control access to airports within their jurisdictions, Congress expressly found that access restrictions to public airports "must be carried out at the national level."   *Id*. § 47521(3)-(4).   This is express preemption in the field of access to public airports and aircraft noise.

161.   The FAA has promulgated extensive regulations, published at 14 C.F.R. § 161 ("Part 161"), which create a uniform process for airport sponsors to seek permission to introduce access restrictions at airports.

162.   ANCA prohibits airport sponsors from imposing regulations that restrict a Stage 3 aircraft's ability to access a public airport unless the sponsor complies with Part 161 and the FAA grants permission.

163.   To date, no airport has successfully obtained permission from the FAA to impose an access restriction on Stage 3 aircraft via the Part 161 process or otherwise.

164.   Indeed, ANCA's requirements for enacting access restrictions for Stage 3 aircraft are remarkably stringent.   Proprietors must obtain, *inter alia*, (i) FAA approval for the restriction or (ii) the unanimous consent of *all* aircraft operators affected by the restriction.   49 U.S.C. § 47524(c)(1).

165.   Federal courts and the FAA have both interpreted § 47524 as a requirement that all public airports comply with Part 161 before any access restriction affecting a Stage 3 aircraft can be enforced.   *See* 14 C.F.R. §§ 161.101, 161.301(c).

166.   Defendants have not sought nor obtained FAA approval for the access restriction imposed on Plaintiffs (whether based on the illegal Lease Restriction, the

Access Plan, or otherwise).

167.   Defendants have also failed to obtain unanimous consent of all operators (as evidenced by this lawsuit).

168.   Moreover, even assuming that Defendants attempted to meet Part 161's strictures, they would have had to demonstrate to the FAA, among other things, that the Restriction:  (i) is reasonable, non-arbitrary and non-discriminatory; (ii) does not create an unreasonable burden on interstate or foreign commerce; (iii) is consistent with maintaining the safe and efficient use of navigable airspace; (iv) does not conflict with a law or regulation of the United States; (v) has received adequate opportunity for public comment; and (vi) does not create an unreasonable burden on the national aviation system.  49 U.S.C. § 47524(c)(2).

169.   Each of the showings required to gain FAA approval are absent in Defendants' decision to unilaterally impose an access restriction through the Restriction.

170.   Specifically, Defendants:  (i) intentionally discriminated against JSX in an effort to prohibit JSX from accessing the Airport; (ii) drafted the Restriction, threatened the FBOs from working with Plaintiffs, and refuse to consider non-SIDA portions of the terminal to prevent JSX from providing routes and services at both JWA *and* each of the cities to which JSX departed from or flew to from JWA (e.g., Las Vegas) which unreasonably burdens interstate commerce; (iii) enacted the Restriction, threatened the FBOs from working with Plaintiffs, and refuse to consider non-SIDA portions of the terminal for reasons unrelated to maintaining the safe and efficient use of navigable airspace given that JSX has an impeccable safety record and no incidents or accidents at JWA or anywhere else; (iv) acted contrary to and in express conflict with ANCA, the Airline Deregulation Act (*see infra*), and the Equal Protection Clause of the Constitution; (v) entirely ignored the widespread public response to the Board's decision to ban JSX from operating at the Airport

(e.g., 5,500 emails sent to the Board in opposition in a 48-hour time period related to the Board's approval of the Leases); and (vi) unreasonably burdened the national aviation system by relying on an unlawful and preempted local regulation that prohibits JSX from operating at JWA (either the Restriction or the Access Plan).

171.   The proper avenue for establishing that a local regulation or access plan meets the requirements of ANCA is through the Part 161 process, not through the deliberations of local governmental bodies.   In other words, the County's deliberations are expressly insufficient to justify an access restriction—that is precisely what Congress was preventing by enacting ANCA.  49 U.S.C. § 47521(2).

172.   The County cannot circumvent ANCA's requirements or the FAA's processes to impose access restrictions on Stage 3 aircraft.  FAA procedures are mandatory and comprehensive, and local attempts to regulate access that are not enacted in compliance with Part 161 are federally preempted.

173.   On information and belief, Defendants have not successfully completed the Part 161 process and thus the Restriction, the threats to the FBOs from working with Plaintiffs, and refusal to consider non-SIDA portions of the terminal is invalid and preempted by ANCA.

174.   In sum, Defendants violated ANCA (and its implementing regulations) by imposing the Restriction, threatening the FBOs from working with Plaintiffs, and refusing to consider non-SIDA portions of the terminal that forbids JSX from operating at JWA.

175.   Furthermore, Defendants' unlawful and unconstitutional conduct was and is intentional.  Defendants were and are fully aware that any access restriction imposed by the Restriction or Access Plan (which was amended most recently in January 2021) is subject to ANCA's processes and thus subject to preemption.

176.   For example, at the September 15, 2020, public meeting where the County adopted the Restriction, Orange County Counsel Leon Page advised the

Board that "when the Board is deliberating over these leases there are two . . . provisions of federal law … that we are mindful of . . . [One] source of federal law is found in ANCA . . . and that generally [] limits the County from taking action to regulate noise." Counsel Page went on to describe the process for adopting local regulations such as the one embodied in the Restriction as "a very strict, very stringent FAA approval process."[17]

177.   Defendants' adoption of the Restriction, threats to the FBOs, and refusal to consider non-SIDA portions of the terminal was also blatantly in favor of a more politically favorable group (e.g., large, traditional airlines who operate pursuant to Part 121 and/or the City of Newport Beach), unreasonable, and discriminatory. Among other things, by eliminating JSX from JWA, Defendants freed up additional customer capacity that can be reallocated to the major air carriers and catered to the residents of the City of Newport Beach who seek elimination of all jet traffic that affects them with noise. Defendants also protected the major air carriers, including (but not limited to) Southwest, Spirit, and Frontier, from competing with JSX's unique (and preferred) method of traveling to and from JWA on many of the same routes served by such major air carriers.

178.   Defendants' conduct is further unreasonable because it interferes with Congress' stated goals in enacting ANCA and begin the expressly disallowed process of localities creating a patchwork of regulations.

**Airline Deregulation Act ("ADA") Preemption**

179.   Under the ADA, 49 U.S.C. § 41713(b)(1), "a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier."

---

[17]   https://ocgov.granicus.com/player/clip/3785?view_id=8&redirect=true   (last accessed November 27, 2020).

AMENDED COMPLAINT

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

180.   A state or local law is "related to" a price, route or service if it has "[1] a connection with, or [2] reference to" a price, route, or service. *American Airlines v. Wolen*, 513 U.S. 219, 223 (1995); *Air Transport Ass'n of Am. v. City & Cty. Of San Francisco*, 266 F.3d 1064, 1070-71 (9th Cir. 2001).

181.   ADA "services" "refers to such things as the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided." *Air Transport Ass'n*, 266 F.3d at 1070-71.

182.   ADA "rates" and "routes" generally refer to the point-to-point transport of customers.  "Rates" indicates price; "routes" refer to courses of travel. *Id.*

183.   The only exception to the ADA's broad and explicit preemptive effect is that the ADA "does not limit a State, political subdivision of a State, or political authority of at least 2 States that owns or operates an airport served by an air carrier holding a certificate issued by the Secretary of Transportation from carrying out its proprietary powers and rights."  49 U.S.C.A. § 41713(b)(3).  This is known as the "proprietary right exception" and it is very narrowly interpreted.

184.   Under this narrow exception, a local government's exercise of its proprietary powers must be reasonable, nondiscriminatory, nonburdensome to interstate commerce, and designed not to conflict with the ADA and its policies.

185.   The validity of any local regulation therefore depends on (1) whether the regulation "is related to a price, route, or service of an air carrier"; (2) if so, whether regulation amounts to an exercise of its propriety powers; and (3) if it is an exercise of proprietary powers, whether such exercise is reasonable, nondiscriminatory, nonburdensome and not in conflict with the ADA.  If all these showings are met, the local regulation is exempted from preemption by 49 U.S.C. § 41713(b)(3).

186.   Here, the County's conduct:  (1) prohibits JSX from providing certain

routes (*e.g.*, no city pairings with JWA are permitted, despite them being permissible under federal law) and certain services (e.g., customer service to and from JWA are eliminated); (2) is a flawed attempt by Defendants to exercise their proprietary powers (as any other explanation would not even arguably justify them); and (3) is unreasonable (they target a safe operator, JSX, for no reason), discriminatory (they single out JSX), and burdensome (they irreparably harm JSX, JSX's employees based at JWA, *and* the traveling public who prefer JSX's unique business model and socially distanced travel experience).

187. In waging its campaign against JSX, the County repeatedly hides behind the Access Plan – the set of local regulations that govern access at JWA. But the Access Plan sets up a false dichotomy establishing a preference for operations at the terminal (Access Plan § 8.1.7(a)) but giving the Airport Director discretion to approve a qualified commuter air carrier's operation from an FBO (Access Plan § 8.1.7(b)). This framework is unnecessarily restrictive because it forecloses operations from other locations at the airport where JSX can legally be accommodated under federal law.

188. The County has refused to even respond to JSX's proposals to operate from these alternative locations. Meanwhile, the County has flatly refused to allow non-SIDA access to the terminal while poisoning the well with the Airport's FBOs and thwarting JSX's effort to operate from any one of them. In total, the County's policies foreclose JSX's access to the Airport.

189. The Access Plan also discriminates against qualified commuter carriers and JSX in particular. The Access Plan regulates the number of passengers who may use JWA in a particular year. The allocation scheme treats commercial air carriers (major airlines like Southwest and Spirit) differently than qualified commuter carriers. Commuter carriers must apply annually for an allocation from

a pool of a potential 400,000 passengers.[18]

190.    The major airlines are eligible to receive an authorization to operate one or more "average daily departures" or "ADDs" from JWA. Class A and Class E ADDs have been awarded to major airlines for a period of five years, January 1, 2021 through December 31, 2025.[19]  In addition, commercial air carriers receive seat capacity allocations that are valid for the same five-year duration.[20]

191.    The Access Plan systematically places the commuter operations of JSX in a tenuous state of having to reapply for passenger allocations on an annual basis. Despite the inherent discrimination against on-demand, commuter air carriers like JSX, the County purports to treat JSX exactly the same as the major scheduled airlines by mandating that it use a SIDA portion of the terminal.  (Exhibit I) ("any operations by JSX related to the service of air passengers and their baggage must be provided through and in facilities designated for that purpose by the County in the Thomas F. Riley Terminal as a Regularly Scheduled Commercial User consistent with any authorized Passenger Capacity Allocations for the 2012 Plan Year.").

192.    Under the ADA, Defendants cannot lawfully impose or enforce the Restriction or Access Plan as it constitutes a regulation related to JSX's rates, routes, and services.

193.    Because the Restriction and Access Plan are arbitrary, discriminatory,

---

[18] Indeed, the Access Plan has become increasingly restrictive for commuter air carriers like Plaintiffs.  In the 2015 Amendments to the Access Plan, the allocation for commuter air carriers was reduced from 500,000 to 400,000.  (Access Plan § 3.5.1 (Historical Note).)  In the 2003 Amendments, the definition of a Commuter Air Carrier was changed to include aircraft configured with not more than seventy (70) seats, an increase from fifty (50) seats.  This change increased the discriminatory impact of the Access Plan on Part 135 operators like JSX that are limited to aircraft with thirty (30) seats.

[19] Access Plan §3.1.1-.2.

[20] Access Plan §3.3.1.

and burdensome it is *per se* preempted under the ADA.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**Defendants' Conduct Is Preempted by Federal Law and Violates the Supremacy Clause of the U.S. Constitution – ANCA**
**(49 U.S.C. §§ 47521-47534)**
**(Against all Defendants)**

194.   Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

195.   The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."  U.S. Const., art. VI.

196.   Under the Supremacy Clause, local regulations which run contrary to federal law are preempted, and thus invalid and unenforceable.

197.   Defendants' adoption of the Restriction and reliance on the Access Plan is contrary to and interferes with federal law, including but not limited to ANCA.

198.   Defendants' unwillingness to consider other non-SIDA accommodations at the Airport is arbitrary, discriminatory, and violates federal law.

199.   The adoption of the Restriction and reliance on the Access Plan constitutes an access restriction for JSX's Stage 3 aircraft.

200.   Defendants did not comply with Part 161.

201.   All air carriers present at JWA did not unanimously consent to the new mandatory Restriction or the amendments to the Access Plan.

202.   The adoption of the Restriction and reliance on the Access Plan is not an action which falls within the narrow proprietary right exception because, among other reasons, Defendants purposefully acted in violation of federal law by

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

1    intentionally discriminating against JSX.

2        203.   The adoption of the Restriction and reliance on the Access Plan is

3    unreasonable, arbitrary, and discriminatory.

4        204.   The adoption of the Restriction and reliance on the Access Plan is *per*

5    *se* unreasonable and unlawful as Defendants took this action in violation of federal

6    law.

7        205.   The adoption of the Restriction and reliance on the Access Plan is

8    preempted by federal law.

9        206.   The adoption of the Restriction and reliance on the Access Plan

10   violates the Supremacy Clause of the U.S. Constitution.

11       207.   Moreover, the Restriction and Access Plan constitute an access

12   restriction that did not exist prior to the passage of ANCA.  Indeed, Stage 3 on-

13   demand carriers were able to operate out of JWA's FBOs prior to the enactment of

14   ANCA (and in fact can still operate out of JWA's FBOs until January 1, 2021).

15       208.   The Restriction and Access Plan violates ANCA and JWA's Access

16   Plan must be amended or eliminated as a result of this ANCA violation.

17       209.   As a result of Defendants' unconstitutional conduct, JSX seeks both

18   preliminary and permanent injunctive relief prohibiting Defendants from enforcing

19   the Restriction, Access Plan, or otherwise banning JSX from operating at JWA as

20   of January 1, 2021.

21       210.   Plaintiffs also seek declaratory relief that makes clear that Defendants

22   cannot prohibit JSX's operations through local law, regulation, or other provision

23   having the force of law.

24       211.   Plaintiffs specifically seek an injunction preventing Defendants from

25   enforcing the Restriction, Access Plan, or anything else that prohibits Plaintiffs from

26   accessing the Airport on reasonable and non-discriminatory means.

27       212.   Plaintiffs also seek a declaration that the Restriction and amended

28

Access Plan is invalid under ANCA.

213.   JSX also seeks a declaration that JWA's Access Plan is invalid and rendered nugatory due to Defendants' unlawful conduct in violation of ANCA.

214.   Plaintiffs also seek nominal damages due to this completed and on-going Constitutional violation.

## SECOND CAUSE OF ACTION

**Defendants' Conduct Is Preempted by Federal Law and Violates the Supremacy Clause of the U.S. Constitution – ADA**
**(49 U.S.C. §§ 1371 *et seq.*)**
**(Against all Defendants)**

215.   Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

216.    The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." U.S. Const., art. VI.

217.   Under the Supremacy Clause, local regulations which run contrary to federal law are preempted, and thus invalid and unenforceable.

218.   Defendants' adoption of the Restriction and reliance on the Access Plan is contrary to and interferes with federal law, including but not limited to the ADA.

219.   Defendants' unwillingness to consider other non-SIDA accommodations at the Airport is arbitrary, discriminatory, and violates federal law.

220.   The adoption of the Restriction and reliance on the Access Plan constitutes a regulation affecting the "rates, routes, and services" of JSX.

221.   The Restriction and Access Plan prevent JSX from flying certain routes (*e.g.*, it prohibits any flight to or from JWA).

222.   The Restriction and Access Plan also prevent JSX from offering

aeronautical services (e.g., it prohibits any customer services at JWA).

223. The adoption of the Restriction and reliance on the Access Plan is not an action which falls within the narrow proprietary right exception, as the adoption of the Restriction was unreasonable, arbitrary, and discriminatory.

224. JSX has operated safely at JWA for years and has an impeccable safety record.

225. JSX operates the quietest fleet of commercial aircraft at JWA.

226. JSX was singled out by Defendants as acknowledged by Mr. Rondinella.

227. Defendants' decision to target JSX is arbitrary and unconstitutional.

228. The adoption of the Restriction and reliance on the Access Plan is *per se* unreasonable and unlawful as Defendants took this action in violation of federal law.

229. The adoption of the Restriction and reliance on the Access Plan violates the Supremacy Clause of the U.S. Constitution and is thus preempted and invalid.

230. Defendants' unconstitutional and discriminatory conduct has harmed, and will continue to harm, JSX irreparably by causing a substantial loss of business, damaging JSX's business reputation and goodwill, and putting JSX at a significant competitive disadvantage to other carriers operating at JWA.

231. As a result of Defendants' unconstitutional conduct, JSX seeks both preliminary and permanent injunctive relief prohibiting Defendants from enforcing the Restriction, Access Plan, or otherwise banning JSX from operating at JWA as of January 1, 2021.

232. JSX also seeks declaratory relief that makes clear that Defendants cannot prohibit JSX's operations through local law, regulation, or other provision having the force of law.

233.   JSX specifically seeks an injunction preventing Defendants from enforcing the Restriction and a declaration that the Restriction is invalid under the ADA.

234.   Plaintiffs also seek nominal damages due to this completed and on-going Constitutional violation.

### THIRD CAUSE OF ACTION

**Deprivation of Equal Protection –**
**U.S. Const. Amend. XIV and 42 U.S.C. § 1983**
**(Against all Defendants)**

235.   Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

236.   The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

237.   Defendant Mr. Rondinella is a "person" within the meaning of 42 U.S.C. § 1983 and acting under color of state law as to the allegations in this Complaint, including the following deprivation of Plaintiffs' equal protection rights.

238.   Defendant County is a "person" within the meaning of 42 U.S.C. § 1983 and acting under color of state law as to the allegations in this Complaint, including the following deprivation of Plaintiffs' equal protection rights.  The County has mandated and officially adopted a policy, ordinance, regulation and/or decision that violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

239.   Defendants' adoption of the Restriction and reliance on the Access Plan is happening for the sole purpose of singling out JSX for discriminatory treatment in violation of the Equal Protection Clause.  Defendants do not prohibit the operations of any other on-demand carrier.  JSX is the only Part 135 operator

prohibited from accessing the FBOs at JWA.

240.   Defendants have no legitimate justification or rational basis for instituting the new Restriction or relying on the Access Plan other than to discriminate against JSX and prohibit it from operating at JWA.

241.   Defendants' unwillingness to consider other non-SIDA accommodations at the Airport is arbitrary, discriminatory, and violates federal law.

242.   Defendants intentionally treated JSX differently than any other operator at the Airport.

243.   The Restriction and Access Plan is not rationally related to any legitimate state interest.  Rather, Defendants acted irrationally and arbitrarily with the sole intent of discriminating against JSX and preventing it from operating at JWA.

244.   Defendants intentionally discriminated against JSX, in whole or in part, for the illegitimate purpose of showing political favoritism to the larger Part 121 carriers utilizing JWA to the detriment of JSX.

245.   Defendants' adoption of the discriminatory Restriction and reliance on the Access Plan, without any rational basis, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

246.   Defendants' unconstitutional and discriminatory conduct has harmed, and will continue to harm, JSX irreparably by causing a substantial loss of business, damaging JSX's business reputation and goodwill, and putting JSX at a significant competitive disadvantage to other carriers operating at JWA.

247.   JSX was irreparably harmed by Defendants' unconstitutional and discriminatory conduct because its constitutional rights have been infringed.

248.   As a result of Defendants' unconstitutional conduct, JSX seeks a declaratory judgment declaring that Defendants' new Restriction is unconstitutional, and that Defendants are not permitted to prohibit JSX from

operating at JWA.

249.   As a result of Defendants' unconstitutional conduct, JSX seeks a declaratory judgment declaring that Defendants' Access Plan is unconstitutional, and that Defendants are not permitted to prohibit JSX from operating at JWA.

250.   As a result of Defendants' unconstitutional conduct, JSX seeks both preliminary and permanent injunctive relief prohibiting Defendants from enforcing the Restriction or otherwise banning JSX from operating at the Airport as of January 1, 2021.

251.   JSX also seeks attorneys' fees as permitted by 42 U.S.C. § 1988.

## FOURTH CAUSE OF ACTION

### Interference with Prospective Economic Relations
### (Against all Defendants)

252.   Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

253.   Plaintiffs have developed an economic relationship with the traveling public who utilize the Airport for departures and/or arrivals.  This economic relationship was beneficial to Plaintiffs and is likely to remain beneficial so long as Plaintiffs can remain operating at the Airport.

254.   Plaintiffs have separately developed an economic relationship with ACI Jet.  This economic relationship was beneficial to Plaintiffs and was likely to remain beneficial up until Defendants interfered and ensured that ACI Jet would no longer partner with Plaintiffs at risk of losing their lease or otherwise being punished by Defendants.

255.   Defendants knew of these economic relationships before, during, and after they engaged in unlawful acts to eliminate Plaintiffs from the Airport.

256.   Nevertheless, Defendants intentionally passed the Restriction, threatened the FBOs, informed Plaintiffs in writing that they should tell their customers that Plaintiff could no longer fly with Plaintiffs from John Wayne Airport

from  January 1, 2020 and refuse to permit any other non-SIDA areas of the Airport (including in the terminal) in an intentional effort to eliminate Plaintiffs from the Airport.

257.   By engaging in the aforementioned conduct, Defendants intended to disrupt Plaintiffs' economic relationship with the traveling public, and/or knew that disruption was certain or substantially certain to occur when it began systematically trying to eliminate Plaintiffs from the Airport.

258.   Defendants have succeeded in disrupting Plaintiffs' relationship with the traveling public.

259.   Defendants continue to disrupt Plaintiffs' relationship with the traveling public.

260.   This has harmed Plaintiffs in excess of $2 million.   This amount continues to increase each day that Plaintiffs do not have a long-term solution at the Airport as required by federal law.

261.   Defendants' conduct is and was a substantial factor in causing Plaintiffs' harm.

262.   Plaintiffs seek damages for Defendants' unlawful interference.

263.   Plaintiffs have complied with the California Tort Claims Act claims submission process by submitting a claim on June 17, 2021.   Defendants have repeatedly stated Plaintiffs' claims are moot and that Plaintiff has suffered no damage, effectively rejecting any of Plaintiffs' bases for relief stemming from Defendants' wrongful conduct, including tort remedies alleged herein.

## FIFTH CAUSE OF ACTION

### Interference with Contractual Relations
### (Against all Defendants)

264.   Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

265.   Plaintiffs had a contract with ACI Jet to utilize ACI Jet's FBO that ACI

Jet said it would extend for two years, through the end of 2022.

266. Defendants knew about the contract, including because Plaintiffs informed the County about it several times.

267. Nevertheless, Defendants passed the Restriction and threatened ACI Jet to ensure that ACI Jet would not host Plaintiffs at the Airport. Defendants' conduct prevented performance and made performance more expensive and difficult, including but not limited to ACI Jet withdrawing its agreement to extend its support of Plaintiffs at the FBO through the end of 2022 and instead trying to evict Plaintiffs in January 2021.

268. Defendants knew that this result would follow their threats to ACI Jet and their other conduct set forth herein.

269. Defendants intended that this result would follow their threats to ACI Jet and their other conduct set forth herein, or knew that disruption of performance was certain or substantially certain to occur.

270. Defendants' conduct harmed Plaintiffs in that Plaintiffs now have nowhere to deplane or enplane its customers on a long-term basis. Plaintiffs have also had to pay additional fees and costs at ACI Jet due to ACI Jet's desire to remove them to appease Defendants.

271. This has harmed Plaintiffs in excess of $2 million. This amount continues to increase each day that Plaintiffs do not have a long-term solution at the Airport as required by federal law.

272. Defendants' conduct is and was a substantial factor in causing Plaintiffs' harm.

273. Plaintiffs seek damages for Defendants' unlawful interference.

274. Plaintiffs have complied with the California Tort Claims Act claims submission process by submitting a claim on June 17, 2021. Defendants have repeatedly stated Plaintiffs' claims are moot and that Plaintiff has suffered no

1  damage, effectively rejecting any of Plaintiffs' bases for relief stemming from
2  Defendants' wrongful conduct, including tort remedies alleged herein.

3  **PRAYER FOR RELIEF**

4       WHEREFORE, Plaintiffs respectfully request that this Court enter an order
5  and judgment:

6  A.    Declaring that the County must provide an accommodation to Plaintiffs
7        that grants them access to the Airport on reasonable and non-
8        discriminatory terms in a manner that does not negatively impact
9        Plaintiffs' rates, routes, or services;

10 B.    Enjoining Defendants and any party in privity of contract with
11       Defendants from imposing or enforcing the Restriction or otherwise
12       imposing or enforcing any law, regulation, policy, or other provision
13       having the force and effect of law which restricts JSX's access to JWA,
14       or affects JSX's ability to offer federally authorized rates, routes, and
15       services at JWA;

16 C.    Waiving the requirement for the posting of a bond as security for entry
17       of temporary or preliminary injunctive relief;

18 D.    Damages, including nominal damages, for the completed and on-going
19       violations of law and tortious interference claims;

20 E.    Declaration that Defendants must provide Plaintiffs with all necessary
21       licenses and approvals to operate at the Airport;

22 F.    Declaration that Defendants must inform all FBOs and other service
23       providers at the Airport that partnering with Plaintiffs will not result in
24       punitive treatment;

25 G.    Awarding Plaintiffs their costs, expenses, and reasonable attorneys'
26       fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

27 H.    Granting such other and further relief as the Court deems just and

28

proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all claims triable by a jury, pursuant to Federal Rules of Civil Procedure, Rule 38, and Central District of California Local Rules, Rule 38-1.

1 | Dated: June 17, 2021        Respectfully submitted,

2

3        By:    */s/ William V. O'Connor*
              William V. O'Connor

4        BRIDGFORD, GLEASON & ARTINIAN

5        Richard K. Bridgford (CA SBN 119554)
       Richard.Bridgford@Bridgfordlaw.com

6        Michael H. Artinian (CA SBN 203443)
       Mike.Artinian@Bridgfordlaw.com

7        26 Corporate Plaza, Suite 250
       Newport Beach, CA 92660

8        Telephone: (949) 831-6611
       Facsimile: (949) 831-6622

9        COOLEY LLP

10        William V. O'Connor (CA SBN 216650)
       woconnor@cooley.com

11        4401 Eastgate Mall
       San Diego, CA 92121-1909

12        Telephone: (858) 550-6000
       Facsimile: (858) 550-6420

13        COOLEY LLP

14        J. Parker Erkmann (*Pro hac vice*)
       perkmann@cooley.com

15        1299 Pennsylvania Avenue, NW, Ste 700
       Washington, DC 20004-2400

16        Telephone: (202) 776-2036
       Facsimile: (202) 842-7899

17        COOLEY LLP

18        Andrew D. Barr *(Pro hac vice)*
       abarr@cooley.com

19        1144 15th Street, Suite 2300
       Denver, CO 80202-2686

20        Telephone: (720) 566-4121
       Facsimile: (720) 566-4099

21        Attorneys for Plaintiffs Delux Public Charter, LLC

22        d/b/a JSX Air and JetSuiteX, Inc.

23

24

25

26

27

28